**Joseph Ray TERRY, Plaintiff,**

v.

**Tony E. GALLEGOS, Chairman of the United States Equal Employment Opportunity Commission, Defendant.**

**No. 92–2729–MI/A.**

United States District Court, W.D. Tennessee.

May 16, 1996.

---

Donald A. Donati, Donati & Associates, P.C., Memphis, TN, for plaintiff.

Lisa Olson, Carlotta Wells, Anne Gulyassy, U.S. Department of Justice, Washington, DC, Stuart Gerson, Office of Attorney General, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

McCALLA, District Judge.

Plaintiff Joseph Ray Terry, Jr., a white male attorney employed as Regional Attorney by the EEOC, brings this suit against Tony E. Gallegos, as Chairman of the United States Equal Employment Opportunity Commission (EEOC), alleging race and sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1) and 2000e–3(a) (1995). A bench trial was conducted on November 21, 22, 23, 25, 1994, and December 1, 2, 5, 15, 1994, with final submittals and argument completed on September

29, 1995.[1] As set forth in this Opinion, the Court finds that the EEOC discriminated against plaintiff on the basis of race as to Counts I, III, and IV, discriminated on the basis of sex as to Claim III, and illegally retaliated against plaintiff as to Counts II, III, and IV.

The EEOC is a federal government organization entrusted with the investigation and prosecution of alleged violations of Title VII of the Civil Rights Act of 1964, and other anti-discrimination statutes. (Stip. 5.) Plaintiff Terry has been the Regional Attorney in the EEOC's Memphis District Office from 1979 to the present, during which time he has served in other EEOC positions in a temporary capacity.

Over the course of his employment at the EEOC and during the period relevant for the present case, plaintiff applied to or expressed interest in a significant number of Senior Executive Service (SES) positions.[2] This action raises four claims involving his non-selection for ten SES positions; plaintiff applied for eight of the positions raised in this claim.[3]

█ This action is based on three Equal Employment Opportunity (EEO) administrative claims filed by plaintiff in connection with selections to the SES, the EEOC's highest rank for management officials.[4] (Stip. 1,

1. Terry, Donald Lee Hollowell and Joseph Stanley Bennett testified for the plaintiff on November 22, 1994. Louise Terry, Gilbert Sandate, John Edward Cato, Gerald S. Kiel, John P. Rowe, and Marie Louise Terry testified for the plaintiff on November 23, 1994. Dr. Randy Dupont testified for the defendant on November 25, 1994. James Harrison Troy testified for the defendant on December 1, 2 and 5, 1994. William Bartlett also testified for defendant on December 2, 1994. Ronnie Blumenthal, Phillip Sklover, and Joel Reisman testified for the defendant on December 5, 1994. Walter Grabon, Roscoe Edison Elkins, Theodore E. Ravis, Jr., and Patricia Johnson testified for the defendant on December 15, 1994. Also on December 15, 1994, rebuttal witnesses Randy Dupont and Carson Owen testified.

The following depositions were taken and admitted as evidence in this case: (1) Lynn Y. Bruner, taken on August 11, 1994; (2) Richard P. Theiss, taken on February 8, 1994; (3) John D. Schmelzer, taken on February 8, 1994; (4) Kenneth J. Kryvoruka, taken on February 8, 1994; (5) Thomas P. Hadfield, taken on August 10, 1994; (6) Anthony DeMarco, taken on August 29, 1994; (7) Constance Dupre, taken on November 4, 1993; (8) Joseph J. Schutt, taken on November 4, 1993; (9) Justice Clarence Thomas, taken on February 7, 1994; (10) Odessa Shannon, taken on June 16, 1994; (11) Evan J. Kemp, taken on November 3, 1993; (12) Donald R. Livingston, taken on June 15, 1994; (13) Gerard Fleischut, taken on December 19, 1994; (14) Joseph Bennett, taken on December 19, 1994; and (15) Paula Choate, taken on September 16, 1993.

2. Plaintiff has applied to the following SES positions: (1) Memphis District Director in September 1984 (Tr. 82; Stip. 44); (2) St. Louis in November 1985 (Tr. 136; Ex. 79; Stip. 50); (3) Charlotte in November 1985 (*Id.*); (4) Philadelphia in November 1985 (*Id.*); (5) Indianapolis in February 1986, first vacancy announcement (Tr. 137; Ex. 65); (6) Indianapolis in November 1986, second vacancy announcement (Tr. 158–

159; Ex. 66); (7) San Francisco District Director in 1990 (Stip. 62; Ex. 84); (8) Director of Determinations Review Programs in 1989 (Ex. 129.); (9) Director Field Management Programs in 1990 (Tr. 128; Stip. 62); (10) Charlotte District Director in 1991 (Tr. 177–78; Stip. 63); (11) Atlanta District Director in 1991 (*Id.*); (12) Seattle District Director in 1991 (Tr. 187; Stip. 68); (13) Deputy General Counsel in May 1992 (Tr. 193; Stip. 71). Plaintiff was not offered any of these positions. Plaintiff's applications for the positions of San Francisco District Director, Director of Determinations Review Programs, and Director Field Management Programs were returned to plaintiff on the ground they were incomplete. (Tr. 172; Stip. 62.)

3. The positions are: (1) Atlanta in 1984 (to which Terry did not apply); (2) Cleveland (to which Terry did not apply); (3) St. Louis; (4) Indianapolis; (5) Charlotte in 1986; (6) Philadelphia; (7) Charlotte in 1991; (8) Atlanta in 1991; (9) Seattle; and (10) Deputy General Counsel.

4. A plaintiff can bring a Title VII action in federal court only for discrimination "like or reasonably related" to the conduct identified by the plaintiff in the complainant's EEOC complaint. *Box. v. A & P Tea Company*, 772 F.2d 1372, 1375 (7th Cir.1985). All claims raised by plaintiff in the present matter meet this requirement.

From 1985 to 1992, plaintiff brought a total of ·five administrative EEO cases, but does not raise two in this matter. (Stip. 1.) First, on January 26, 1984, plaintiff submitted a claim form, and on March 21, 1985, filed an EEO claim, asserting race and sex discrimination in the selection for the District Director position of Atlanta, which culminated in the class action, *Jurgens v. Thomas,* 29 FEP Cases 1561, 1982 WL 409 (N.D.Tex. 1982). (Tr. 111; Ex. 15; Stip. 25.) The *Jurgens* district court found that the EEOC discriminated against white male employees, and that its affirmative action plans gave clear preferences for minorities and women. (Ex. 160–61.) Plaintiff

7.) On May 6, 1985, plaintiff brought an EEO complaint alleging that he was not promoted to the Memphis, Atlanta, Cleveland and St. Louis District Director positions as a result of race discrimination and retaliation. (Stip. 2; Ex. 1, 14; Case No. ME 85–72.) On November 14, 1991, plaintiff brought an EEO complaint alleging that he was not promoted to the Seattle, Charlotte, and Atlanta District Director positions as a result of race and sex discrimination, and retaliation. (Stip. 3; Ex. 6; Case No. 9100150–HQ.) On December 21, 1992, plaintiff brought an EEO complaint alleging that he was not promoted to the Deputy General Counsel position as a result of discrimination based on race and retaliation. (Stip. 4; Ex. 7; Case No. 9200145–ME.)

In the action before this Court, plaintiff specifically asserts the he was discriminated against on the following bases: (1) race and retaliation as to the SES District Director selections in Atlanta and Cleveland in 1984,[5] (2) race and retaliation as to the SES District Director selections in St. Louis, Indianapolis, Charlotte, and Philadelphia in 1986–1987; (3) race, sex, and retaliation in connection with the SES District Director selections in Charlotte, Atlanta, and Seattle in 1991; and (4) race and retaliation in connection with his non-selection for the SES position of Deputy General Counsel in 1992. Plaintiff's Proposed Findings of Fact and Conclusions of Law (Pl.'s Findings, 2–3).

received $13,500 in back pay. (Tr. 110; Stip. 25.) Plaintiff's remaining EEO claim, brought on February 3, 1983, alleged that Julia Poussaint, then Memphis District Director, had denied him a bonus on the basis of race and sex, and had retaliated and discriminated against him in the terms and conditions of his employment. (Tr. 111; Stip. 24.) In the fall of 1984, plaintiff received $750 as settlement in that case. (Stip. 24.)

5. On defendant's motion at the conclusion of plaintiff's case in chief, the Court dismissed the Memphis component of plaintiff's first claim, pursuant to Fed.R.Civ.P. 52(c). (Tr. 1011.) The Court found that plaintiff failed to demonstrate a prima facie case of race discrimination, and did not demonstrate that the selecting officials knew of plaintiff's protected action, i.e., his prior EEO claims. Bennett stated that he did not consider plaintiff's claim against Poussaint when recommending Grabon for the Memphis District Di-

## I. BACKGROUND

The SES was created by the Civil Service Reform Act of 1978, 5 U.S.C. § 3391, et seq.[6] (Stip. 7.) Since January 1983, approximately forty-four SES positions have existed in the EEOC, twenty-three of which are District Director positions, and the remaining twenty-one are headquarters management positions. (Stip. 6.)

SES officers are selected on a competitive or non-competitive basis.[7] Selections are made from a certification list, ideally from the smaller select number deemed "best qualified" on that list. (Tr. 54.) Competitive selection requires applying through a formal process, whereby the EEOC announces SES vacancies and accepts applications from persons in and outside the EEOC. (Tr. 1422–24.) Non-competitive selection requires neither an application nor a formal vacancy announcement, and is available only to graduates of the Candidate Development Program (CDP). (Stip. 37.)

The CDP is a part-time program that includes formal government executive training and temporary assignments, designed to allow candidates to acquire management skills necessary for service in the SES. (Stip. 37.) Persons compete for acceptance to the CDP under procedures similar to those required for entry into the SES.[8] (Stip. 30.) In June 1983, plaintiff became a member of the CDP's first graduating class. (Stip. 31, 39.)

rectorship. (Tr. 975.) Plaintiff makes no claim to the contrary.

In Plaintiff's Findings of Fact and Conclusions of Law (Pl.'s Findings), plaintiff states that he does not bring a claim for the St. Louis District Director selection in 1984, which he named in the complaint.

6. Guidelines applying to the SES and CDP are found in the SES Handbook, EEOC Order 515 (dated July 15, 1981 and modified in 1983), 530 and 590. (Stip. 32.)

7. EEOC employees already serving in SES positions can be reassigned without applying. The distinction between competitive and noncompetitive selection applies only to persons who have never before served in the SES at the time of their selection to the SES.

8. Admission into the CDP is a highly competitive process. (Tr. 1453; Thomas dep. 11.)

Upon completion of the CDP, an employee is certified, for a designated length of time, by the Office of Personal Management (OPM) as having satisfied the executive qualifications required for SES officials.[9] (Stip. 30, 37, 39.) The CDP graduate who satisfies the requirements of a certain SES position may be appointed to the SES without having to apply; but appointment·is not guaranteed. (Stip. 37–38; Thomas dep. 111, 114–15.) According to Justice Thomas, a former Chairman of the EEOC, the purpose of the CDP was to "groom managers in the federal government who were then eligible for non-competitive selection to SES level position any place in the government."[10] (Thomas dep. 10.) William Bartlett, Director of the Compliance and Control Division in the Office of Federal Operations, testified that there was a "keen interest in the selections for the candidate program ... these were the people who were being identified for future placement." (Tr. 1454.) Gilbert Sandate, Director of EEO and responsible for adjudicating employment discrimination complaints filed by EEOC employees, testified that CDP graduation "was tantamount to eligibility for non-competitive appointment to an SES position prior to any further consideration of other candidates." (Tr. 577.) A CDP graduate's name appears on certification lists for SES vacancies, irrespective of whether that graduate has expressed interest or applied for the position in question. (Tr. 603.)

Ten persons have graduated from the CDP since its inception.[11] (Tr. 1870; Stip. 58.) Of these, five have been non-competitively placed into SES positions.[12] Plaintiff and Ronnie Blumenthal comprised the first CDP graduating class. (Tr. 1637; Stip. 59.) CDP participation and, specifically, the CDP graduations of plaintiff and Blumenthal, were widely publicized within the EEOC. (Tr. 46–47, 566, 1422.)

During the relevant period, the Chairmen of the EEOC were Justice Thomas (from 1982 to March 1990) and Evan Kemp (from March 1990 to April 1993). (Stip. 20.) The heads of the various EEOC offices report to the Chairman. (Stip. 5.) James Troy held the position of Director of the Office of Program Operations (OPO) from October 1, 1984, until January 27, 1995. (Stip. 11.) The OPO has oversight responsibility for investigating and processing charges of employment discrimination, and jurisdiction over the district offices; the Director of OPO reports to the Chairman. (Stip. 8–10.) Another office, that of the Office of the General Counsel (OGC), has primary responsibility for litigating cases on behalf of the EEOC. (Stip. 16.) The OGC has two SES positions, that of General Counsel and the Deputy General Counsel.[13] Donald R. Livingston has been

**9.** The Qualified Review Board (QRB) is required to review an applicant's executive qualifications in all cases except where the applicant successfully completed the CDP. (Stip. 37.)

**10.** Justice Thomas and Sandate also stated that the agency invested a great deal of time and money in the CDP, and hence, in CDP graduates. (Tr. 577; Thomas dep. 11.)

**11.** The graduates are: (1) Terry; (2) Ronnie Blumenthal, white female; (3) Lawrence Bembry, black male; (4) Roscoe Edison Elkins, white male; (5) Hilda Rodriguez, hispanic female; (6) John Ross, white male; (7) Dierdre Flippen, black female; (8) Linda Jackson, black female; (9) Susan Reilly, white female; and (10) Jacy Thurmond, black male. (Tr. 1870; Stip. 58.)

**12.** The five CDP graduates who were promoted non-competitively are: (1) Bembry, selected for Director, Administrative Management Services in OPO; (2) Blumenthal, selected for Director, Office of Systemic Investigations and Individual Compliance Programs in OPO; (3) Rodriguez, selected for Special Assistant to the Director of OPO; (4) Elkins, selected for District Director in Charlotte; (5) Flippen, selected for Director, Federal Sector Programs within OFO. (Tr. 58, 1088–96, 1600, 1870; Stip. 60–61.) John Ross left the EEOC, and none of the remaining four are currently serving in SES positions. As of the filing of the complaint in this matter, Terry and Elkins, two white males, were the only graduate of the SES Candidate Program who was placed into an SES position on an "acting" basis. (Stip. 57.)

**13.** The General Counsel reports to the Chairman, and is responsible for advising the General Counsel and the Commission, and for developing management, personnel and budgetary policies. (Stip. 17–18.) The OGC also has three Associate General Counsels;· one, the Associate General Counsel for Litigation Management Services, is the first line supervisor for the Regional Attorneys in the field or district offices. (Stip. 19.)

acting General Counsel or General Counsel from June 1990 to June 1993. (Stip. 22.)

EEOC field offices are managed by District Directors, who report directly to the appropriate field manager in the OPO.[14] (Stip. 10.) The general duty of the District Director, who is usually an SES officer,[15] is to enforce federal legislation prohibiting discrimination through investigation, conciliation, litigation, and coordination with the district.[16] (Stip. 9.)

The Regional Attorney, a non-SES position, reports to the OGC on issues relating to litigation, and reports to the OPO Director and the District Director of the particular field office on all non-litigation issues. (Stip. 16.) The Regional Attorney is responsible for litigating cases. The Regional Attorney and the District Director, in conjunction, determine whether to recommend filing a civil action. The Regional Attorney then presents the EEOC's recommendation to the Commissioners in a memorandum, for which he and the District Director share responsibility. (Id.)

Currently Regional Attorney of the EEOC's Memphis field office, Terry received his J.D. degree from Loyola University in New Orleans in 1965, and upon graduation, worked for the Civil Rights Division of the United States Department of Justice on voting rights. (Tr. 11–14; See Ex. 87 for Terry's curriculum vitae.) In 1969, Terry became Regional Counsel for Equal Opportunity at the Department of Housing and Urban Development, and in 1970, he worked as the EEOC's Regional Counsel in Atlanta. (Tr. 15–17.) In 1972, plaintiff became acting Regional Attorney of the Atlanta Litigation Center;[17] in 1979, he assumed his present position.[18] (Tr. 18–20, 29.)

While in the CDP, plaintiff worked as (1) Assistant Director of the Alaska Human Rights Commission, from July to September 1981, (2) Assistant to the Director of the NLRB's Memphis office, from April to June 1982, and (3) Director of Region III of the OPO from March to July 1983. (Stip. 33–35.) At the NLRB, plaintiff fully participated in the case management process. (Tr. 43; Fleischut dep. 6–7.) As Director of Region III, plaintiff supervised seven District Directors. (Tr. 44–45.)

On June 27, 1983, plaintiff graduated from the CDP, at which time OPM certified him, until June 27, 1988, as having satisfied the executive qualifications required for the SES. (Stip. 39.) While certified, plaintiff could be selected non-competitively; once his certification had expired, he could only be promoted to the SES by applying and competing for an announced position. (Id.) Effective January 1, 1994, plaintiff's certification was reinstated through December 31, 1996. (Stip. 40.)

On March 3, 1984, Chairman Thomas appointed plaintiff acting District Director in Memphis. (Stip. 41.) Terry remained in

---

14. From 1983 to 1987, the OPO had three SES Field Program Managers, each of whom was responsible for overseeing an area constituting about one third of the district offices. (Stip. 12.) Troy served as Region I (east) director until his appointment as OPO Director. (Id.) In 1987, the OPO was restructured to have two Field Program Managers. (Stip. 13.)

15. Both SES and non-SES positions have various levels, reflecting different pay scales. SES levels range from ES–1 to ES–6, and non-SES levels range from GS–1 to GS–15, with varying pay scales. Non-SES management level positions at the district offices are the Deputy District Director and the Regional Attorney positions. (Stip. 14.) The Deputy District Director supervises and coordinates the enforcement functions of the district office, and serves as acting District Director when the District Director is absent. (Stip. 15.)

16. A District Director's specific functions include developing program objectives, allocating resources within the District, managing the charge processing system, managing the systemic charge processing system, and providing oversight of the administrative functions of the district office litigation program. (Stip. 9.)

17. In March 1972, the EEOC obtained powers beyond advisory and enforcement. As a result, it established five centers to handle all EEOC litigation. Plaintiff's position was executive in nature; he hired and supervised 35 attorneys, three GS–15 supervisors and all the office staff. (Tr. 16–20.) In 1979, the EEOC abolished the litigation centers in favor of the current system.

18. In the interim, Terry left the EEOC. In 1973, he taught law at St. Louis University, and in 1974, established his own civil rights law practice in Atlanta. (Tr. 26–27.) In 1976, he returned to the EEOC. (Tr. 28.)

this position until 1985, at which time he resumed his position as Regional Attorney at the Memphis office.

Since October 1, 1984, Troy as Director of the OPO has signed in concurrence all of plaintiff's performance evaluations. (Stip. 26.) Similarly, Troy has reviewed elements of plaintiff's job duties relating to administration, personnel, employee relations, collective bargaining, budget, travel and legal unit compliance interaction. (*Id.*) Plaintiff's performance evaluations at the EEOC have all been at the highest of five levels, "outstanding," or at the second highest level, "highly effective." [19] With the exception of a 1991 interim appraisal in which plaintiff was criticized for a "few exceedingly poor submissions," [20] all evidence presented in this action demonstrates that plaintiff's performance at the EEOC was highly regarded by supervisors and colleagues.[21] Plaintiff has received several special awards, including 1988 Regional Attorney of the Year in 1989. (Tr. 38–39; Ex. 84.)

## II. APPLICABLE LAW

Title VII of the Civil Rights Act of 1964 provides in relevant part:

It shall be unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). Title VII also provides:

It shall be unlawful employment practice for an employer to discriminate against any of his [or her] employees or applicants for employment ... because [he or she] has made a charge, testified, assisted or participated in any matter in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

 In bringing a discrimination claim, the first step for an employment discrimination plaintiff is to establish a prima facie case of discrimination. The burden of proof to establish a prima facie case lies exclusively

**19.** As Acting Program Director for Region III, from March to June 1983, plaintiff received a rating of "highly effective." (Stip. 35.) In his performance appraisal as acting District Director in Memphis, plaintiff was rated as having met expectations on 12 of 18 performance standards and as having exceeded expectations on six standards. (Stip. 43.) As Memphis Regional Attorney, plaintiff received the following performance ratings: (1) "outstanding" (from October 1, 1985 to September 30, 1986); (2) "outstanding" (from October 1, 1987 to September 30, 1988); (3) "highly effective" (from October 1, 1989 to September 30, 1990); (4) "highly effective" (from October 9, 1990 to September 30, 1991); (5) "highly effective" (from October 1, 1991 to September 30, 1992). (Ex. 155, 177.)

**20.** The appraisal, dated April 23, 1991, is a memorandum addressed to Terry, "thru" Donald R. Livingston, from Philip Sklover, and states in relevant part,

Incumbent should be commended for evening out the workload, thus avoiding 'dumping' during the last quarter. PMs generally range from competent to highly effective, although there have been a few exceedingly poor submissions. See, e.g. *The Mead Corp, Fire Paper Division.* (Ex. 176.) The appraisal also states, "incumbent is exceedingly responsive to Office of General

Counsel requests." (*Id.*) Plaintiff testified that he did not believe this assessment was fair, in part because his decision in *Thacker v. Mead Paper*, Charge No. 253–0812, had support from both his immediate supervisor, Walter Grabon, ·and a district judge. *See supra* text accompanying n. 78–81. Livingston testified that he also objected to plaintiff's recommendation in *Northwest Airlines* (referred to in the record and submittals without further citation). *Id.*
Plaintiff testified that there was "a tendency to ... have something negative to say in the interim appraisal ... the message was supposed to be not perfect." (Tr. 415.)

**21.** For example, Donald Hollowell, an attorney at the EEOC from 1966 to 1985, supervised plaintiff and found his performance superior. (Tr. 427.) Gerald S. Kiel, Regional Attorney at the EEOC's Baltimore field office, testified that he had worked under plaintiff at the Atlanta office, and thought plaintiff excelled as manager there. (Tr. 638–39.) In her letter concerning Terry's admission to the CDP, Beverly Gary wrote, "Ray played an instrumental role in establishing the Commissioner's Atlanta Regional Litigation Center." (Ex. 35.) In addition, plaintiff received high evaluations for having improved the Memphis office as District Director. (Tr. 103–04; Ex. 156.)

with the plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 502–03, 508–10 n. 3, 113 S.Ct. 2742, 2745, 2748 n. 3, 125 L.Ed.2d 407 (1993). Plaintiff can establish a prima facie case by direct or indirect evidence.[22] In the absence of direct evidence of discrimination, the plaintiff may meet his burden by demonstrating inferentially that he was a victim of intentional discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

 Since the plaintiff in this case is relying on indirect evidence, he must initially establish a prima facie case, thereby creating a rebuttable presumption of discrimination. To establish a prima facie case of intentional discrimination based on failure to promote, a plaintiff must establish each of the following elements: (1) he is a member of the protected class; (2) he was qualified and applied for a promotion; (3) despite his qualifications, he was denied the promotion; and (4) the employer filled the position with another person who was not a member of the plaintiff's protected class. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (setting forth criteria for a plaintiff who brings an illegal discharge claim); *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (applying the *McDonnell Douglas* factors to discriminatory failure to promote); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992). Plaintiff also may establish his prima facie case by showing that he was a member of a protected class and that a "comparable, non-protected person was treated better." *Mitchell*, 964 F.2d at 582–83.[23]

 In a retaliation claim, a plaintiff alleges that he has been mistreated for engaging in protected activity, and that the employer's motivations are therefore illicit. As with a race or sex discrimination claim, the ultimate burden of proving retaliation in a Title VII action remains at all times with the plaintiff. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in an activity protected by Title VII; (2) his exercise of civil rights was known by the defendant; (3) the defendant thereafter took an employment action adverse to plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Christopher v. Stouder Memorial Hospital*, 936 F.2d 870, 877 (6th Cir.1991); *Zanders v. National Railroad Passenger Corp.*, 898 F.2d 1127, 1134–35 (6th Cir.1990); *Wrenn*, 808 F.2d at 500.

 In order to satisfy the causal-link element of the prima facie case requirement, a plaintiff must produce evidence "sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action." *Zanders*, 898 F.2d at 1135. The mere fact that a plaintiff suffers an adverse employment action subsequent to his participation in protected activity is insufficient to establish the fourth element of the prima facie case requirement. *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272–73 (6th Cir.1986). Nonetheless, establishing a prima facie case of retaliation is a burden easily carried. *Wrenn*, 808 F.2d at 500.

 Assuming plaintiff meets his prima facie case of discrimination or retaliation, the burden of production, not persuasion, shifts to defendant to articulate a legitimate non-discriminatory reason for its action. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Wrenn*, 808 F.2d at 501; *Zanders*, 898 F.2d at 1134 (stating that the sequence and burden of proof applicable to disparate treat-

---

22. A plaintiff can establish a prima facie case with evidence that is directly probative of a defendant's intent when dealing with the particular plaintiff. *Dybczak v. Tuskegee Institute*, 737 F.2d 1524, 1528 (11th Cir.1984) (citing *Lee v. Russell County Board of Education*, 684 F.2d 769 (11th Cir.1982)). *Blalock v. Metals Trades*, 775 F.2d 703, 707 (6th Cir.1985). Plaintiff does not base his claim on direct evidence.

23. *See Brown v. State of Tennessee*, 693 F.2d 600, 603 (6th Cir.1982) (defining factor four as: "other employees of similar qualification who were not members of the protected group were indeed promoted at the time the plaintiff's request for promotion was denied").

ment cases are applicable to retaliation claims). By producing evidence (whether ultimately persuasive or not) of non-discriminatory reasons, defendant can sustain its burden of production, thus placing itself in a better position than if it had remained silent. *St. Mary's Honor Center,* 509 U.S. at 508–10, 113 S.Ct. at 2748. Defendant is not required to prove the absence of a discriminatory motive. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

Although the burden of production shifts to the defendant, the burden of persuasion always remains with the plaintiff. *Mills v. Ford Motor Co.,* 800 F.2d 635, 639 (6th Cir.1986). Once the employer has come forward with a non-discriminatory reason for firing the employee, the presumption of discrimination is rebutted, and the plaintiff must produce sufficient evidence from which the fact-finder may reasonably reject the employer's explanation. *Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95; *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1083 (6th Cir.1994). The trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against him because of his race or sex or prior assertion of his rights. *Id.* at 510–11, 113 S.Ct. at 2749. Rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, but rejection does not compel judgment for the plaintiff.

The Title VII plaintiff at all times carries the ultimate burden of proving that the proffered reasons are pretextual and that the adverse employment action is the product of an intent to discriminate because of the plaintiff's race. *Id.; Galbraith v. Northern Telecom, Inc.,* 944 F.2d 275, 279 (6th Cir.1991), *cert. denied,* 503 U.S. 945, 112 S.Ct. 1497, 117 L.Ed.2d 637 (1992). A plaintiff may show pretext by demonstrating by a preponderance of the evidence either, "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." *Manzer,* 29 F.3d at 1084.

The plaintiff has " 'a full and fair opportunity to demonstrate' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision' ... and that race [or sex] was." *St. Mary's Honor Center,* 509 U.S. at 515–17, 113 S.Ct. at 2752 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095). Proof of pretext can occur throughout the trial. *Ford v. Nicks,* 703 F.Supp. 1296, 1302 (M.D.Tenn.1988). During the pretext stage, the trial judge evaluates all the evidence and theories in order to determine which explanation of the challenged employment action the judge believes. *Id.* In making a determination of whether the testimony proves a violation of Title VII, the court should consider reasonable inferences drawn from the *totality* of facts, the conglomerate of activities, and the entire web of the circumstances presented by the evidence on the record as a whole. *Id.* at 1303 (quoting *Jeffries v. Harris County Community Action Association,* 425 F.Supp. 1208, 1216 (S.D.Tex.1977), *vacated on other grounds,* 615 F.2d 1025 (5th Cir.1980); *accord EEOC v. St. Joseph Paper Co.,* 557 F.Supp. 435, 439 (W.D.Tenn.1983)).

### III. DISCUSSION

The central claims raised by plaintiff involve the Atlanta selection in 1984, the Indianapolis selection, the Detroit District Directorship offer, the 1991 Seattle and Charlotte selections, and the Deputy General Counsel selection. The Court's discussion will focus on these claims, and include other selections raised in plaintiff's complaint to the extent they supplement or explain the above mentioned claims. This action turns on defendant's motivations for plaintiff's non-selection. For this reason, the Court's Opinion requires a lengthy factual analysis.

### A. Plaintiff's History of Non–Selection at the EEOC

Terry has sought, but has not achieved, placement in the SES since 1981. (Tr. 39.) He alleges that he has not been placed into

the SES because the EEOC discriminates against white males generally,[24] that he has been the victim of such discrimination and the victim of retaliation for bringing EEO complaints.

In 1981, plaintiff competed for admission to the CDP, believing that successful completion would improve his chances of obtaining an SES position. To support the reasonableness of this belief, plaintiff introduced a letter to the Commissioners from Beverly Gary, Director of Personnel, which states, "[c]ompletion of this program satisfies all requirements for certification by a qualified review board and permits graduates to enter noncompetitively any SES position for which he or she is technically qualified." (Tr. 40; Stip. 31; Ex. 1.) Sandate confirmed the reasonableness of Terry's belief that graduation from the CDP most likely would result in

24. At trial, substantial evidence was introduced of general discrimination by the EEOC against white employees and particularly, against white male employees. This evidence is described in brief below. The Court does not rely on the evidence of general discrimination in determining that the defendant is in violation of Title VII as to all Counts raised by plaintiff.

In *Jurgens*, the District Court found clear evidence of preferences for minorities and women in the EEOC's affirmative action plans. (Ex. 160, 161.) Terry, Troy and Justice Thomas stated that the EEOC took no action to increase the representation of white males, and none had personal knowledge of any distribution of copies of the *Jurgens* injunction to the EEOC supervisors, despite the *Jurgens* order requiring such distribution. (Tr. 117, 440; Thomas dep. 61–63, 71–73; Ex. 161.) Justice Thomas wrote a memorandum dated August 11, 1983, to the EEOC Commissioners directing them to implement the injunction. (Ex. 162.)

The EEOC Management Directive specifically requires that the EEOC conduct an appropriate work force analysis to determine whether a manifest imbalance exists in the employment of various EEO groups, including white males. (Ex. 27.) Although a statistically significant disparity exists in the EEOC with respect to white males, the EEOC has not altered its affirmative action policies or hiring criteria to increase the representation of white males. (Tr. 607–08, 1204–06, 1209–14; Thomas dep. 61–63, 71–73.) In 1987, five years after the finding in *Jurgens* and three years after the injunction was entered, there were still only two white male SES District Directors out of 21 total positions. (Tr. 101.) No white has held an executive position in the Atlanta office, and since 1976, no white male has been Deputy General Counsel. (Tr. 31–32, 194.)

Witnesses testified regarding preferential treatment given to minorities by the EEOC. Dupre testified that the EEOC was "an old boy network that was black." (Dupre dep. 63–64.) Donald Muse, then the EEOC's Director of Field Operations, testified that certain EEOC offices, including Atlanta, had acquired a reputation for setting aside management jobs for various races. (Muse dep. 16.) Muse also testified that there was an attitude among white males at the EEOC that it was futile to apply to such jobs. (*Id.* at 94.) Terry explained that the underlying reason behind his leaving the EEOC in 1973 was the EEOC's rejection of a qualified white female attorney, Elizabeth Rindskopf, in favor of a less qualified black attorney. According to Terry, Rindskopf was not selected because Chairman Brown did not want three white GS–15 level personnel in the Atlanta Litigation Center. (Tr. 23, 25–26.) Terry also testified that the Atlanta, St. Louis and Cleveland offices had a "history of being black offices," and that the following offices had a history of hiring only black managers: Charlotte, Birmingham, New Orleans, and Memphis. (Tr. 95.)

Two witnesses, both white males, testified that they had personally experienced race discrimination by the EEOC. John. P. Rowe, District Director of the EEOC's Chicago office, testified that he applied unsuccessfully for a number of SES positions, and believes discrimination contributed to the selection of black males in positions superior to him over the course of many years at the EEOC. (Tr. 682–83.) After several attempts to contact Troy about his non-selection (Troy repeatedly claimed to be too busy to meet with Rowe), Rowe directly contacted Chairman Thomas who stated that he was unaware of Rowe's interest in the SES. (Tr. 684–86.) Subsequent to this meeting with Justice Thomas, Rowe was accepted into the CDP and in 1990, was appointed to the Chicago District Directorship. (Tr. 687.) Another witness, Gerald Kiel, Regional Attorney at the Baltimore District office, testified that he has applied to a number of CDP and SES positions, but has never been appointed. (Tr. 643–45.) Kiel, a *Jurgens* class member, believes his inability to obtain an SES position is the result of race discrimination and retaliation. (Tr. 656.) He stated,

[I]t just seemed to be a pattern ... that if you were a white male, you weren't being selected for these jobs, either through the formal process or for another way that they went through the gyrations selecting a director ... I base that on ... when I see the person selected, that routinely the person is a minority or the person is a woman. And I have been ... deemed to be a highly qualified applicant based on my history of performance ... the Baltimore office ... [is] among the top five and sometimes higher on our litigation program.

(Tr. 656–57.) Kiel also testified that he now believes it is futile to apply to other SES positions. (Tr. 650.)

placement in the SES.[25] (Tr. 577.)

On March 3, 1984, plaintiff was appointed acting District Director of the Memphis EEOC office. At the time of this appointment, the overall performance of the Memphis District Office was poor and the morale of the staff low. (Tr. 443; Stip. 42.) Odessa Shannon, then Director of OPO, urged Terry to take the position, stating that Terry was the only person in the EEOC at that time qualified to keep the Memphis office together. (Tr. 76.) Terry accepted a temporary placement, but told Joseph Stanley Bennett, then Regional Director of Region II in OPO, that he was interested in a permanent District Directorship in Atlanta or St. Louis. (Tr. 77, 91.) During his one-year period as acting District Director, plaintiff's pay did not increase, but he was held to the same standards and expectations as a District Director. (Tr. 81–82.) Applying these standards, plaintiff performed well and improved the Memphis office. (Tr. 444.)

In 1984, while plaintiff was acting District Director of the Memphis District Office, the following four SES District Director vacancies were announced: (1) Memphis; (2) St. Louis; (3) Atlanta; and (4) Cleveland. Plaintiff submitted an SF–171 form, with a cover letter expressing interest in the Memphis District Directorship. (Tr. 83; Ex. 44.) Plaintiff did not apply for the other available District Directorships in part because he believed he would be appointed Memphis District Director as a result of his present good performance in that office. (Tr. 91–92; Ex. 44.) Similarly, he believed Harold Ferguson, then Deputy Director in Cleveland would be appointed District Director of the Cleveland office, and Harris Williams, then acting District Director of the Atlanta office, would be

appointed to the Atlanta Directorship.[26] (Tr. 92.) Plaintiff also reasoned that, should those individuals not be appointed, his application was unnecessary because, as a CDP graduate, he was eligible for non-competitive placement. (*Id.*)

Plaintiff was not selected for any of the four District Directorships.[27] Ferguson, a black male, was selected District Director of the Cleveland office, and Williams, a black male, was selected District Director of Atlanta. Walter Grabon, a white male, was selected for the Memphis position. Bennett, who was a party to the meeting with Troy concerning the 1984 District Director openings, explained that Grabon was selected because the EEOC wanted someone from outside the Memphis office to assume the Directorship. (Tr. 482.) Bennett also stated that Terry had made a mistake in failing to apply for the SES in St. Louis, Cleveland and Atlanta. (Tr. 103.)

Williams served as Charlotte District Director before the EEOC's reorganization in 1979, served as the Deputy Director in Charlotte and Detroit, and as acting District Director of Atlanta. (Tr. 1098–1100; Ex. 51.) Ferguson served as Deputy Director in Cleveland for several years before his appointment to the SES. (Tr. 61, 495–96.) Unlike plaintiff, Williams never held any rank above a GS–15 before his appointment to the Atlanta District Directorship, had not completed the CDP, had not graduated from high school, had been found by a federal district judge to have retaliated against a union official for processing sexual harassment charges, and had been found to lack credibility as a sworn witness by that same

---

**25.** In addition, shortly after his graduation from the CDP, Joyce Goins, personnel specialist responsible for monitoring SES vacancy announcements, contacted plaintiff to discuss placing him on various certification lists. (Tr. 33.) Such contact is indicative of Terry's eligibility for non-competitive placement, and the accelerated SES placement opportunities open to him as a CDP graduate. (Tr. 53–54.)

**26.** Plaintiff further testified that the St. Louis and Atlanta offices had a history of being black offices. (Tr. 95.)

**27.** Because the Court dismissed the Memphis claim, only a brief discussion of Grabon's appointment and qualifications is provided here. Plaintiff had higher education and greater experience than Grabon, who had not held management positions comparable to those held by plaintiff, and who, unlike plaintiff, did not have a Juris Doctor degree; however, Grabon was qualified for the position.

(Tr. 130–31.) Similarly, as plaintiff does not pursue his claim as to the St. Louis position, the relative qualifications of the person selected are not covered here.

judge.[28] (Tr. 121–131; Ex. 195.) Similarly, Ferguson did not have executive experience comparable to that of plaintiff; plaintiff had been a GS–15 longer, and had held positions requiring a greater breadth of responsibility and knowledge. (Tr. 123, 190.)

On November 25, 1985, plaintiff submitted a SF–171 in which he stated his interest in the District Directorships in St. Louis, Charlotte, Philadelphia and any "other" SES positions. (Tr. 135–36; Stip. 50; Ex. 79.)

In January 1986, Sandate telephoned plaintiff and initiated a discussion regarding plaintiff's terms for settling his May 6, 1985, EEO charge. (Tr. 145, 569, 576; Ex. 14.) Troy had authorized Sandate's negotiations with Terry, and had specifically asked Sandate to determine what District Directorship Terry desired. (Tr. 575–76, 578.) Plaintiff told Sandate that he was interested in all pending SES vacancies except Detroit. (Tr. 146, 578–79.) Sandate remembers reporting this conversation to Troy, and specifically recalls telling Troy that plaintiff expressed interest in the St. Louis and Indianapolis positions. (Tr. 579–80.) Troy testified that he does not recall being informed by Sandate that Terry was not interested in the Detroit Directorship.[29] (Tr. 1127.)

In February 1986, Bennett offered Terry the District Directorship of EEOC's Detroit office. (Tr. 147, 454–58; Stip. 52; Ex. 98.) Terry explained to Bennett that the Detroit Directorship was the only District Director vacancy for which he had expressly stated disinterest, and reiterated his interest in all other SES vacancies. (Tr. 147.) Bennett recommended that Terry accept the selection because the Detroit office needed his legal skills, and Detroit was the only offer of a District Directorship that plaintiff would receive at that time. (Tr. 147–48.)

Concerned that defendant would excuse subsequent non-selection to the SES on his rejection of the Detroit offer,[30] Terry decided to accept the offer provided he received a decent salary increase. (Tr. 148–51.) In response to negotiations with plaintiff, Bennett contacted Troy in an attempt to raise the offer above an ES–4 level. (Tr. 151–52, 456–57.) Upon learning that Troy refused to raise the Detroit offer above an ES–4 level (which salary would result in a marginally higher gross income but lower net income given tax differences between the regions), plaintiff declined the offer in late February 1986. (Tr. 152–53; Ex. 97.)

At the time Terry declined the offer, he reiterated his interest in the other available Directorships to Bennett by telephone and letter. (Tr. 155, 457; Stip. 53; Ex. 97.) Plaintiff had no further contact with Bennett regarding the positions. (Tr. 137–38; Stip. 54; Ex. 65.)

On February 20, 1986, plaintiff applied for the Indianapolis District Directorship, emphasizing in his cover letter that, as a CDP graduate, he was not required to apply. (*Id.*) The Indianapolis position was subsequently cancelled. (*Id.*) In October 1986, the Indianapolis Directorship was announced for a second time. (Stip. 55.) On November 4, 1986, plaintiff again applied and stated his eligibility for non-competitive placement. (Tr. 158–159; Ex. 66.) On April 3, 1987, the position was cancelled again. (Stip. 55; Ex. 78.) On May 8, 1987, the Indianapolis position was announced for a third time. (Tr. 160; Stip. 55; Ex. 64.) Plaintiff did not

**28.** In *Cato v. Norton,* Civil Action No. C–C–78–304 (W.D.N.C.1981), a district court found that Williams and his deputy engaged in invidious discrimination in violation of Title VII, against John Cato, employed as an enforcement supervisor at the EEOC since 1972. (Tr. 625–27; Ex. 163–64.)

**29.** In his deposition, Troy stated regarding the conversation with Bennett, "I assume he told me what [Terry] was interested in. I don't remember him telling me that." (Tr. 1222.)

**30.** Plaintiff referred to this as a "Ford Motor Company" offer. In *Ford Motor Company v.*

*EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), the United States Supreme Court held that a good faith offer of a job tolls back pay liability, even when the employee turned down the offer. In *Ford,* the employer successfully argued that it had not made any other offers to the plaintiff in that case because, by turning down an offer already made, the employee demonstrated that he was overly choosy, and unwilling to give the flexibility required of a high ranking employee within the company. (Tr. 150.)

apply because he felt doing so would be futile.[31] (Tr. 161.)

Plaintiff's OPM certification expired in June 1988, and around 1989, plaintiff ceased applying to or expressing interest in any SES openings. (Tr. 166; Stip. 39.) On April 17, 1991, he applied for the Charlotte District Directorship. (Stip. 63; Ex. 71.) On June 7, 1991, plaintiff wrote to Kemp expressing interest in the Atlanta District Directorship. (Tr. 178; Ex. 54.) The Charlotte vacancy was subsequently cancelled. On June 18, 1991, two African–Americans were non-competitively selected to fill the vacancies.[32] Plaintiff received a letter from Troy returning plaintiff's application to the Atlanta position, stating it had been filled by reassignment of an SES person. (Tr. 186; Ex. 55.)

In 1991, plaintiff and Janet Leino, a white female, applied to the Seattle District Directorship; both were on the certification list for that position. (Ex. 95.) Leino had served as Seattle District Director, at a GS–15 level, since 1988, and had received highly effective performance ratings for fiscal years 1989 through 1991.[33] (Stip. 69; Tr. 1136–39; Ex. 91–92, 94.) Before that time, she was a GS–12 at the EEOC, and had worked for the NLRB as a labor management relations investigator and a supervisory investigator. (Tr. 187–88, 191–92; Ex. 88.) The Seattle District Director Ratings Panel gave plaintiff a slightly higher rating than Leino. (Admission 24.) On July 24, 1991, Troy recommended Leino for the position, and on September 3, 1991, she was appointed. (Tr. 1140, Stip. 70; Ex. 89.)

On May 28, 1992, Terry and James Neely, a black male, applied for the position of Deputy General Counsel. (Stip. 71; Ex. 111, 116.) Neely was not a CDP graduate, had slightly lower evaluations, experience, and responsibilities than plaintiff. (Tr. 198–99.) Neely graduated from law school in 1972, at which time plaintiff was already directing the Atlanta litigation center. (Tr. 193.) At the time of his application for Deputy General Counsel, Neely was serving as acting Deputy General Counsel, to which position he was appointed on December 5, 1991. (Stip. 73; Ex. 117.) Plaintiff argues that Neely's appointment as acting Deputy General Counsel constitutes discriminatory preselection, constructed to make Neely the more qualified candidate at the time of selection for the Deputy General Counsel position. The Deputy General Counsel Ratings Panel rated Neely slightly higher than plaintiff. (Tr. 717–20; Ex. 109.) On July 6, 1992, Neely was appointed Deputy General Counsel. (Stip. 74.)

### B. Credibility Assessment of James Troy

James Harrison Troy has been employed at the EEOC since August 8, 1978, in the SES since January 28, 1980, and as Director of OPO since October 1, 1984. (Tr. 1028–29.) Evaluating his testimony is central to the Court's analysis in this matter because Troy had extensive power and discretion in selecting SES officials. Further, defendant's proof of its legitimate non-discriminatory reasons for the District Director selections rests almost exclusively on Troy's testimony, particularly with regard to the Atlanta, Indianapolis, Charlotte and Seattle positions.[34]

As Director of OPO, Troy selected the vast majority of SES officers, and all but five of the present District Directorships have been filled by Troy. (Tr. 1082, 1166–73, 1187–88.) With only one exception, Justice Thomas in his capacity as Chairman followed Troy's appointment recommendations, and Chairman Kemp has followed all of Troy's recommen-

---

**31.** Mike Reynolds, a white male, who was on the certification but not the 'best qualified' list, was appointed District Director of Indianapolis. (Stip. 56.)

**32.** Marsha Drane, a black female, was reinstated to the SES and assigned to the Charlotte District Directorship. (Stip. 62.) Chris Roggerson, a black male, was reassigned from the District Director position in Baltimore to that in Atlanta. (Stip 64.)

**33.** Before that time, she had been a field investigator in the Seattle District office for two years. (Tr. 1139–40.) Leino worked at the NLRB as an investigator from 1969 to 1981. In 1981, she left to get a Master's degree in social work and public administration, and returned to the NLRB in 1983. (Ex. 88.)

**34.** In addition, Bennett supplied limited testimony regarding the Atlanta and Cleveland District Director selections.

dations. (Tr. 1188–89; Thomas dep. 22–23.) Justice Thomas testified that Troy has been the "defacto" decision-maker on selections to the SES. (Tr. 1189.) In addition to holding a powerful position,[35] Troy had great discretion in how he exercised his power. Troy did not follow formal selection procedures. Testimony and exhibits demonstrate that OPM regulations require that the ERB oversee the entire merit selection process. (Ex. 29.) In practice, since Troy has served as Director of OPO, the ERB has not followed the merit selection process for entry into the SES.[36] (Tr. 1177–83.)

**35.** Troy had the most senior status of any SES employee, and all other SES persons at headquarters reported to Troy. (Tr. 1158–59.)

**36.** The OPM handbook is the guide for all government agencies on how to operate the SES program. (Tr. 1371; Ex. 29.) Troy described the ERB's role as "pro forma," and stated that the ERB may not even see the list of SES candidates. (Tr. 1177–83.) In addition, Bartlett testified that from around 1987 to 1990, the agency ceased using a ratings panel to make a specific recommendation as to whom were the best qualified or highly qualified candidates, and failed to include or rate everyone who was qualified; thereby giving Troy an even greater level of discretion. (Tr. 1464–65.)

**37.** On cross-examination, Terry was impeached with his testimony in *Lorenzo D. Cole v. Gallegos,* C.A. No. 93–1094 (October 23, 1991):

Q: [In *Cole*] the question was asked: "In your testimony, you said that you did not review applications?" And then what was your answer?
A: "I didn't mean to say I didn't review them. I didn't go through them item by item, but yes, I reviewed the applications to see basically what recent experience people had. The only reason I would know things about some of the people I talked about." . . .
Q: Now, that directly contradicts your testimony today doesn't it, Mr. Troy?
A: Yes, it does, but it must be in a different context. I'm sorry.
(Tr. 1284–85.)

**38.** On cross-examination, Troy's testimony on direct was impeached with an affidavit he had signed prior to trial:

Q: So the impression that you're giving here that you were hiring people because of their NLRB experience in your reference to Jackie Shelton is not correct?
A: Must not be.
Q: Did you write it that way to deceive the Judge who was going to read it?
A: I didn't write it.
Q: Who wrote it?

Troy was impeached on a number of issues, some material in this case and others tangential to the case but significant in their reflection on the credibility of Troy's testimony. In response to defense questions regarding his testimony on direct, at deposition, and in other cases, Troy admitted that his prior testimony "directly contradicts,"[37] left a misimpression,[38] and was "false."[39] (Tr. 1282, 1291–92, 1294, 1296.) Troy explained the discrepancies between his testimony at trial and his prior testimony, stating that he "misread your question"[40] and had

A: Someone on my staff, I guess.
(Tr. 1296–97.)

**39.** On cross-examination in *Cole*, Troy was impeached with a declaration he had signed:

Q: [W]ould you read for me the third line beginning with "in particular?" . . .
A: "In particular, EEOC hired Jeanette Leino from NLRB as a director of its Seattle district office in July of 1988."
Q: And that statement is false, isn't it, Mr. Troy?
A: Yes, because I didn't put the word promoted instead of hired.
Q: And you knew that was a false statement when you made it, didn't you, Mr. Troy?
A: I didn't realize it was a false statement. I was suggesting that she—that we brought her straight in as a district director. I didn't intend that.
Q: You're telling me that in the context of paragraph 5 that you were not intending to give the impression to that Judge that you hired her as district director in July of 1988 because of the NLRB experience?
A: Well, I was not trying to deceive anyone. We should have put the word promoted.
Q: And you clearly knew what the word hired meant at that time, didn't you?
A: Yes, I did.
(Tr. 1290–91.)

**40.** Troy gave the following testimony on cross-examination:

Q: If you would look at page 248 of your deposition. I asked you the question at line 10. "When Mr. Terry sent his response in turning down Detroit, did that affect your consideration of Mr. Terry for future SES positions?" And what was your response at line 13?
A: "No, it did not." . . .
Q: So . . . it affected you for future positions of Mr. Terry on anything that could happen as far as a non-competitive appointment?
A: But it meant that I wasn't going to look for Mr. Terry for a non-competitive appoint-

"misspoken."[41] (Tr. 1249, 1281, 1282–83, 1285.) Terry was impeached with respect to the following matters: (1) his review of applications; (2) his interview procedures; (3) the cancelling of SES vacancies in response to the composition of candidates on the best-qualified list; (4) the transfer of employees to effect their retirement; (5) the hiring of Jackie Shelton; (6) the inclusion of plaintiff's name on the Atlanta certification list; (7) the method of selection for the Cleveland position; (8) the impact of plaintiff's refusal of the Detroit offer on future placements; (9) placement of Pedro Esquivel at a level E–5 scale for entry into the SES; (10) the hiring of Leino for the Seattle District Directorship; (11) his reference to Terry as a racist; and (12) Troy's intervention on Mansfield's behalf.

On direct examination, Troy characterized his role as one removed from decision-making responsibility, and without access to material used in making SES selections. However, the evidence shows that, as a general rule, Troy was notified concerning significant submissions or other occurrences regarding SES positions,[42] and personally reviewed SES applications. While he testified at trial that he did not read SES applications, he stated at deposition that he reviewed applications after receiving the certificate of eligibles to determine what type of recent experience people had. (Tr. 1083, 1281–82, 1284–85.) Troy's involvement in the SES selection process is significant because it confirms his knowledge of applicants' interest in certain SES positions and their respective qualifications. Troy's testimony at trial that he was unaware of plaintiff's NLRB experience because he never reviewed applications is not credible. (Tr. 1286.)

At trial and at deposition, Troy testified that he has never, in his ten years as Director of OPO, interviewed applicants for SES positions. (Tr. 1292.) In *Stern*, Troy testified that he had "interviewed the people on the certificate of eligibles."[43] (Tr. 1293.) On cross-examination, Troy was impeached in the following manner:

Q: Now, which one of your testimony is false, the one in that hearing or the one you gave here today?

A: The one in that hearing.[44]

---

ment. I said I would consider Mr. Terry when he came forward for consideration. That was my answer. That's what I mean, that's exactly what I meant.
Q: That's not what you said, is it, Mr. Troy?
A: That what I meant. Whatever I said, that's what I meant.
Q: What you said was that it did not?
A: And I answered it within the vein of his name being transferred to us as an action, for action.
Q: And the question was about future SES positions, was it not?
A: I misread your question.
(Tr. 1249.)

**41.** On cross-examination Troy was impeached with deposition testimony he had given in this matter:
Q: [T]he question was asked, "You never reviewed applications?" And your answer was, "Well, not under the application process. The only time I would review applications would be when I got a certificate of eligible." Wasn't that your testimony?
A: Correct.
Q: That was the end of your testimony, was it not?
A: Yes, which is in direct contradiction to the top line.
Q: Well, the top line said you didn't review them under the application process. And the application process, is it not, Mr. Troy,

when it comes into the personnel office and they do the initial screening, but then you went on to say that when you get the certificate of eligibles, you would review applications?
A: Maybe I—I must have misspoken, Mr. Donati.
(Tr. 1282–83.)
Troy also stated that he "misspoke" when testifying at deposition that the EEOC began focusing on the NLRB model in September 1993; at trial he stated it began it December 1983. (Tr. 1264.)

**42.** For instance, Terry's letter to Kemp concerning the Atlanta District Directorship was at some point distributed to Troy, who ultimately responded to the letter by notifying plaintiff that the Atlanta District Directorship had been filled by SES reassignment. (Tr. 186.)

**43.** *Stern* was held before the Merit Systems Protection Board on February 20, 1991. (Tr. 1250.) (The record supplies no further citation for *Stern*.)

**44.** This testimony also reveals Troy's apparent lack of concern with giving false testimony under oath, and with adhering to court orders. Cato complained to Troy about continuing harassment after the *Cato* ruling in his favor. Troy respond-

(Tr. 1294.) Evidence presented in this case shows that Troy did not interview candidates for SES vacancies; rather, he appointed them based on personal knowledge of the candidates, confirming his role as a Director personally involved in the selecting decision.

Particularly problematic is Troy's testimony regarding cancellations of vacancy announcements. The testimony is significant because two Indianapolis vacancies to which plaintiff applied were cancelled, and the 1991 Charlotte vacancy was cancelled after plaintiff applied and his name appeared on the best qualified list. At trial, Troy testified that he had never cancelled a vacancy because a candidate he did not wish to select was listed as best qualified. (Tr. 1334–35.) However, this testimony was contradicted by his own prior testimony in *Cole*.[45] In addi-

tion, Justice Thomas testified that vacancies might be cancelled when the selecting official was dissatisfied with the names that appeared on the certification list. Justice Thomas speculated that the Indianapolis vacancies were cancelled for this reason.[46]

In *Cole*, Troy testified that he had cancelled vacancy announcements in Detroit and Charlotte because he did not like the people whose names appeared on the certificate list. (Tr. 1336–38.) When cross-examined about this testimony, Troy stated that while he had cancelled the Charlotte vacancy after the certification list had been produced, he had not viewed that list at the time of the cancellation. (Tr. 1338–39.) However, this testimony is contradicted by Troy's own sworn testimony in *Cole*,[47] and by a 1991 memo from

---

ed, "the courts don't run my office." (Tr. 632.) In addition, subsequent to the decision, Troy did not discipline Williams in any manner, despite the court's finding that Williams illegally retaliated against an EEOC employee, acting presumably incompatible with an employee of the Equal Employment Opportunity Commission. Troy also supported rehiring Mansfield despite evidence that Mansfield was guilty of sexual harassment, rape, and sodomy. (Tr. 1108–09.)

**45.** *See infra* n. 47.

**46.** At deposition, Justice Thomas gave the following testimony regarding vacancy cancellations:

Q: Do you have any recollection why those positions [Indianapolis in November and February] had been cancelled? . . .
A: I don't know. I think you probably have to ask Jim [Troy]. It may be they weren't satisfied with the list. There could have been other reasons. I just don't know.
Q: Was that something that you as Chairman were not involved in as far as cancelling?
A: Oh, I wouldn't know it was cancelled. I wouldn't know that, but it's not, that not so unusual.
Q: Did you typically take, take the recommendation of Mr. Troy on let's withdraw this announcement or cancel this announcement?
A: It depends. I mean, you know, these things come up, and I might decided that I just don't want any of these people, or he might say, look, this isn't what I want, and he may cancel it, or we may come up with one of our own candidates.
(Thomas dep. 56–57.)

**47.** On cross-examination, Troy was impeached with his prior testimony in *Cole*:

Q: And in this question, Ms. Cole was asking the question at line 5, "Do you have an opinion about if Mr. Cole's name was the only person that personnel had found qualified for the position of Indianapolis district director and didn't have the other ten names on it, do you have an opinion about what action would have been—what your action would have been regarding his application for the Indianapolis district director position at that time?" And what was your response?
A: "Well, I wouldn't have selected Mr. Cole for reasons I gave. We had to find people who we finally—and we finally gotten there, we had to find people who could handle the case management, the agency's case management system that we made mandatory in '87. People who could walk in and start doing those things without any kind of tags around them. That's what we found, so my answer is I probably would have asked for another certificate, I know that. I would have asked for the job probably to be reannounced."
Q: So there you testified that you probably would have asked that the job be reannounced and get another certificate?
A: Right.
Q: And then Ms. Cole asked the question, "Have you ever done that before; that is, cancel an announcement and ask for another announcement for SES positions?" And your answer?
A: I said, "I don't know about before. We have certainly done it. I didn't mean I had done it. I don't know whether—I don't know whether—I think we did it in Detroit. I'm not sure about that. I thought they were about the same time, but we certainly cancelled the Detroit vacancy and asked that it be reannounced. The same thing in Charlotte, and we sent that person down."

Blumenthal, addressed to Troy, specifically naming candidates (including Terry) who appeared on the certificate of eligibles.[48]

At trial, Troy explained that the second vacancy in Indianapolis was cancelled in order to reassign Constance Dupre to Indianapolis from headquarters in Washington D.C. (Tr. 1122.) However, Dupre resigned from the EEOC on February 6, 1987, and the Indianapolis announcement was not cancelled until April 3, 1987. (Dupre dep. 46.) Thus, Troy's given reason for the second Indianapolis vacancy is not believable.

Troy testified that he had never transferred an employee with the goal of compelling that employee to retire. (Tr. 1220–21.) However, he was contradicted on this point by Bennett, Grabon, Dupre, and Muse.[49] (Tr. 463–67, 1828–33; Dupre dep. 43–44; Muse dep. 74, 78–84.) Further, Grabon found Troy's management methods "Machiavellian." (Tr. 1843.) Troy's practice of transferring employees to achieve his own

> Q: Now, Mr. Troy, you said, "We certainly done it." You're referring to cancelling the position after you have seen the list of eligibles and asking for another announcement, correct?
>
> A: Yes, that's what it says . . .
>
> Q: And—with respect to Charlotte, it was cancelled after you saw a certification list of eligibles?
>
> A: I did not see a certification list in Charlotte.
>
> Q: Well, Mr. Troy, isn't that what your testimony is here, that you cancelled it after you had seen the list of individuals on the list of eligibles?
>
> A: But I didn't see the list of eligibles. I said it was cancelled after the list of—what I meant was, it was cancelled after the list of eligibles was established.
>
> (Tr. 1336–38.)

**48.** On cross-examination, Troy denied having seen the memo from Blumenthal, addressed to Troy:

> Q: Isn't it a fact that Ms. Blumenthal is not supposed to sign a certificate of eligibles until she certifies that the ERB has complied with the OPM regulations in submitting this to the Chairman?
>
> A: That is correct.
>
> Q: So she had signed this saying that it had already been submitted. People—these were the best qualified people, and then where did it go after she submitted it?
>
> A: I guess it went to personnel.
>
> Q: It doesn't go to you, Mr. Troy? Who is it addressed to?

desired end is relevant to the Court's analysis of the District Directorship of Detroit, and supports plaintiff's claim that the offer was made in bad faith.

In a signed declaration submitted in *Cole*, Troy stated that Jackie Shelton was hired by the EEOC because she had NLRB experience.[50] (Tr. 1296; Ex. 212.) At trial, Troy contradicted this testimony, stating that the declaration was incorrect, and his lawyer was responsible for its language. (Tr. 1296–97, 1959–61, 1977; Ex. 212, 218, 219.) Troy as signatory is responsible for the content of the affidavit.[51] The role of NLRB experience in hiring someone is significant to this case because, at the time of the 1984 District Director vacancies, Terry was the only person at the EEOC eligible for non-competitive promotion to the SES who had recent experience with the NLRB's case management procedures. (Tr. 1286.)

On direct examination, Troy testified that he was not sure whether Terry's name ap-

> A: It is addressed to me, but it comes to me from the personnel office.
>
> (Tr. 1340; Ex. 73.)

**49.** Bennett identified several individuals, including himself, who had been involuntarily transferred by Troy. (Tr. 463–67.) Bennett estimated that Troy had given or intended to give about 10 people directed reassignments to force those persons to retire. Bennett resigned from the EEOC rather than accept an involuntary transfer to Detroit. (Tr. 462–63.) Troy had given directed reassignments as a favor to people who sought a way to achieve early retirement. (Tr. 463.) Dupre stated that she had witnessed Troy using his power to transfer to effect the retirement of others, and that he had used this tactic on her. (Dupre dep. 43–44.) She resigned on February 6, 1987, rather than involuntarily transfer. (*Id.* at 46.)

**50.** In approximately 1982 or 1983 the EEOC began to shift its investigative process to a front-end NLRB type investigative model. (Tr. 1268–69.) In his deposition and trial testimony, Troy stated that the EEOC's NLRB focus began in 1983, but at trial, he qualified this statement by adding that, only in 1984 (the period covered by plaintiff's first claim), did the EEOC start making personnel decisions with the NLRB model in mind. (Tr. 1267, 1269–70, 1279–80.)

**51.** Any person, but certainly a Director of OPO, is presumed to know that his signature swears to the content of the affidavit, and that his lawyer's role as drafter of the document is irrelevant for this purpose.

peared on the certification list for the Atlanta District Directorship. (Tr. 1307.) On cross-examination after being impeached with his deposition testimony, Troy stated that plaintiff's name was on the Atlanta certification list, indicating that he was aware that plaintiff was among the pool of qualified candidates. (Id.)

In a counselor's survey report investigating plaintiff's EEO claim of non-selection for Atlanta and Cleveland,[52] Troy explained that Terry was not selected for the Cleveland District Directorship because that position had been filled by reassignment by the Chairman. (Tr. 1313.) When impeached with the report, Troy stated, "I'm certain I didn't say that," and acknowledged that the Cleveland position was open to competitive application. (Id.) The evidence confirms that Troy's survey statement was false.

At trial, Troy stated that Terry's refusal of the Detroit offer demonstrated Terry's inflexibility, and was the reason Troy did not consider plaintiff for future non-competitive selections. (Tr. 1247–48.) At deposition, Troy testified that Terry's refusal of the Detroit offer had no impact on his consideration of Terry for competitive or non-competitive selection. (Tr. 1249.)

Troy testified that he had never requested from the Chairman a pay rate higher than an ES–4 for a new SES appointee. (Tr. 1227.) On cross-examination, he was impeached with evidence he had recommended the appointment of Pedro Esquivel to the SES, at an ES–5 level. (Tr. 1232–33.) Troy stated that he could not recall appointing Esquivel to an ES–5, nor could he recall having any conversation with Bennett regarding Terry's appointment level for the Detroit Directorship. (Tr. 1233.) Bennett stated that he

specifically recalled Troy refusing to pay Terry above an ES–4. (Tr. 457.)

In a declaration, Troy stated that Janet Leino was hired into the District Directorship of Seattle from the NLRB in July 1988. (Tr. 1288; Ex. 211.) He admitted at trial that this was a false statement. (Tr. 1290–91; Ex. 212.) With regard to the Seattle selection, Troy testified that he merely concurred with the recommendation of Leino by Paula Choate, then OPO West Field Manager. (Tr. 1136, 1349–50.) Choate testified that she had no involvement in Leino's selection. (Choate dep. 5–7.) Choate's testimony was clearly credible on this point, and confirms Troy's involvement as selecting official for the Seattle District Directorship.

At trial, Troy denied referring to Terry as a "racist." (Tr. 1046–47.) Bennett and Schutt testified that Troy called Terry a racist on several occasions.[53] (Tr. 467–70; Schutt dep. 74–77.) Troy also testified that he had no role in rehiring Ed Mansfield. Mansfield, a black male, had been removed from the agency because he had inappropriately borrowed money from staff members in exchange for transfers to preferred jobs; he had also been accused of sexual harassment, rape and sodomy. (Tr. 450–54, 1215–16; Schutt dep. 74–76.) Bennett and Schutt testified that, upon learning of Troy's intention to rehire Mansfield, he told Troy that Mansfield had been accused again of sexual harassment. (Tr. 452, Schutt dep. 76–77.) Bennett subsequently learned that Mansfield had been rehired. (Tr. 454.) The testimony of Bennett and Schutt is credible on both points.

As a general rule, the Court cannot rely on Troy's testimony for factual information nec-

---

52. An EEO counselor survey is evidence accumulated by an EEO counselor, for the purpose of resolving an informal complaint filed at the EEOC. This investigation was conducted pursuant to plaintiff's EEO claim as to the Memphis District Directorship.

53. In 1983, Troy told Bennett that Terry was a racist, a conclusion he based on a conversation about Terry's son's favorite baseball player, who was black. During this conversation, Troy felt Terry unnecessarily emphasized race. Plaintiff testified that he was merely expressing his pride that his son had no hesitation choosing a black

baseball player for a role model. (Tr. 242.) Bennett and Hollowell testified that plaintiff had never behaved in any way that would lead them to believe that plaintiff was a racist, and Hollowell stated that plaintiff had a positive relationship with people of all colors. (Tr. 433, 470.) Plaintiff argues that in calling him a racist, Troy demonstrated racial animus. While such a comment signifies an awareness of race issues and racial tension, it does not necessarily signify racial hatred toward the person to whom the statement is directed.

essary to this case, nor as explanation for his selection motivations. The Court examines below plaintiff's claims in the context of Troy's lack of credibility.

### C. Claim I, The Atlanta and Cleveland District Directorships

Plaintiff's first claim involves his non-selection for the SES District Directorships in Atlanta and Cleveland in 1984. At that time, plaintiff had CDP certification and thus, was eligible for non-competitive selection to the SES. The Court's analysis of this claim focuses on the Atlanta District Directorship, concerning which the bulk of evidence was presented.

■ At the close of plaintiff's case in chief, the Court found that plaintiff had demonstrated a prima facie case of race discrimination as to all his claims. As a white male, plaintiff was a minority within the upper levels of EEOC management.[54] (Tr. 440, 1213, 1307.) Second, his experience within the EEOC was extensive and as a CDP graduate, he was presumptively qualified for non-competitive selection without applying for the positions. Third, two African–American males, Williams and Ferguson, were selected for the Atlanta and Cleveland positions. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824–25; *St. Mary's Honor Center*, 509 U.S. at 506–08, 113 S.Ct. at 2747.

Insufficient evidence was presented at trial to support a finding of retaliation under Section 704(a). Plaintiff was a *Jurgens* class member and filed an EEO charge of discrimination as to the Memphis selection in 1984, before the Atlanta and Cleveland selections. However, Troy testified that he did not know that plaintiff had filed these claims, and plaintiff failed to introduce any evidence to the contrary.

■ As plaintiff established a prima facie case of race discrimination, the burden of production shifts to defendant to show a le-

gitimate non-discriminatory reason for its action. Defendant argues, supported by the testimony of Bennett and Troy, that plaintiff was not considered for either position because he did not apply. (Tr. 495, 1097.) Defendant also states that both persons selected were well qualified for the position to which they were appointed: Williams performed well as Deputy District Director in Charlotte and Detroit, and as acting District Director in Atlanta; Bennett recommended Ferguson, and Troy concurred, based on Ferguson's service as Deputy Director in Cleveland for the previous several years. (Tr. 495–96, 1098–1100.) These arguments suffice to satisfy defendant's burden of production.

■ For his discrimination claim to succeed, plaintiff must show that defendant's proffered reasons are pretextual. Disbelief of the employer's asserted legitimate reason for the challenged action does not necessarily entitle plaintiff to a judgment as a matter of law, rather it merely permits the trier of fact to infer the ultimate fact of intentional discrimination. *St. Mary's Honor Center*, 509 U.S. at 510 n. 4, 113 S.Ct. at 2749 n. 4. Plaintiff must show that defendant's proffered reason is false and that the true reason for the adverse action is discrimination. *Id.*

### 1. Failure To Apply

■ Defendant rests the weight of its explanation for plaintiff's non-selection on Terry's failure to apply. The Court finds that this proffered reason is pretextual.

Defendant cites case law for the proposition that, in any employment discrimination case based on failure to promote, the threshold requirement is that the employee apply for the position sought. *Williams v. Hevi–Duty Electric Co.*, 819 F.2d 620, 629 (6th Cir.1985), *cert. denied*, 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 406 (1987); *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1462–

---

**54.** According to EEO Management Directive 707A,

> A group will not be considered underrepresented in a given occupational series or category if that group's representation therein is equal to or greater than the group's participation in the appropriate CLF. (Civilian Labor Force).

(Ex. 139.) Exhibits presented in this case support the categorization of white males as minorities at the EEOC. Defendant makes no argument to the contrary. (Ex. 131, 137, 139, 140, 160–61.)

63 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986). Defendant contends that an employer cannot be required to monitor employee preferences, nor to seek out all individuals who might be interested in jobs that recently have become available. Defendant's Proposed Findings of Fact and Conclusions of Law (Def.'s Findings, 23) (quoting *Reilly v. Friedman's Express, Inc.,* 556 F.Supp. 618, 623 (M.D.Pa. 1983), *Wanger v. G.A. Gray Co.,* 872 F.2d 142, 146–47 (6th Cir.1989).

■■■■ Defendant argues that only two exceptions to the application requirement exist, neither of which plaintiff meets. First, victims of "gross and pervasive discrimination" can argue that futility prevented their application. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 367, 97 S.Ct. 1843, 1870–71, 52 L.Ed.2d 396 (1977). "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Id.* at 365, 97 S.Ct. at 1869–70. Second, failure to apply is excused when an employer promotes employees without advertising the vacancy or soliciting applications. *Box v. A & P. Tea Co.,* 772 F.2d 1372, 1377 (7th Cir.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986).

The Court need not reach the question of whether plaintiff meets either of these exceptions, as the cases requiring application are distinct from the present matter. The CDP admits few people (only ten persons have graduated from the Program since its inception). Admission and successful completion carry certain benefits which make the CDP graduate distinct from non-graduate employ-ees, including the privilege to be promoted to the SES without having to apply.

Defendant argues that neither Troy nor Bennett was aware that Terry could be selected without applying for the position, and that Terry's application for the Memphis District Directorship indicates that plaintiff knew that he was required to apply for SES positions. (Tr. 495, 1097–98.) These proffered reasons are pretextual.

The facts establish that the selection, participation, and graduation of plaintiff (and Blumenthal) from the first CDP class was widely known and publicized within the EEOC. (Tr. 566, 577, 1454.) Sandate characterized plaintiff's graduation as a "big deal" within the agency at the time.[55] (Tr. 566.) Defendant cannot successfully maintain that EEOC officials did not know of Terry's candidacy for the Atlanta or Cleveland selections. Troy acknowledged that plaintiff was on the certificate of eligibles for Atlanta, and the evidence shows that a CDP graduate's name appears on certification lists for SES vacancies, irrespective of whether that graduate has expressed interest or applied for the position in question. (Tr. 603, 1307.) Troy reviewed certificates of eligibles and therefore, would have seen Terry's name on the lists for both positions. In early 1984, plaintiff told Bennett (with whom Troy consulted regarding the 1984 selections) that he was interested in being selected for the Atlanta District Directorship. (Tr. 77.)

■■■ Terry's application only for the Memphis District Directorship does not indicate that he believed application was required, nor that he was interested in the Memphis position to the exclusion of all others. It merely signifies Terry's preference for placement in Memphis.

---

55. CDP participation and graduation were common knowledge at the EEOC, and Troy was present at plaintiff's CDP graduation. (Tr. 1057.) The reasonable inference is that Troy knew the meaning of CDP graduation and the benefits associated with it. Troy's testimony that he first learned in August 1985 that CDP graduates could be non-competitively selected is therefore not credible. (Tr. 1191.) Troy was impeached with a November 1985 affidavit he signed and submitted for an EEO investigation of plaintiff's complaints, in which he stated that Terry was required to apply to SES vacancies.

(Tr. 1192.) Upon further questioning by plaintiff's counsel, Troy stated that he could have known by July of 1985 that Terry was not required to apply. (*Id.*) Other testimony shows that Troy clearly knew by 1985 that plaintiff could be non-competitively placed to an SES position, and raises the inference that Troy had this knowledge in 1984. (Tr. 1639.) In 1985, Troy had several informal discussions with Blumenthal about her appointment to the SES before her promotion, indicating that Troy knew she could be non-competitively placed. (Tr. 1637–39.)

No evidence shows that either Williams or Ferguson (neither of whom are CDP graduates) applied for the positions to which they were appointed.[56] (Tr. 1310–11.) The reasonable conclusion to be drawn from Admissions 69 and 70 [57] is that neither Williams nor Ferguson applied for the positions to which they were appointed.[58] (Tr. 989–90, 1871, 1998.) As a practical matter, EEOC procedures for SES selections were not followed in the 1984 appointments. Thus, defendant cannot successfully characterize plaintiff's non-selection and the selection of Williams and Ferguson as a simple cause and effect of applying for the respective positions.

 Although it was Troy's practice to make written recommendations on SES promotions (he specifically recalled making one for Atlanta), little written documentation of the Atlanta and Cleveland selections remains. (Tr. 1112, 1307–09.) As a general rule the EEOC's retention policy mandates that all records be destroyed within two years; however, in cases where a complaint is raised concerning an EEOC employment decision, the policy requires that all applications or other relevant records be kept during the pendency of an EEO charge or lawsuit. (Tr. 1308, 1365–66.) As plaintiff raised a complaint as to all selections at issue in this case within two years of his non-selection, defen-

dant was bound to retain the records through the pendency of this lawsuit. Lack of their retention allows the Court to draw an adverse inference that such documents would have supported plaintiff's claim. *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir.1987); *National Labor Relations Board v. Evans Packing Co.*, 463 F.2d 193, 197 (6th Cir.1972).

The evidence is clear that as a CDP graduate, Terry was not required to apply to either the Atlanta or Cleveland District Directorship. It is not credible that Troy did not know plaintiff could be non-competitively selected. Contrary to defendant's assertion, as the defacto SES selecting official, Troy reviewed applications for SES positions, knew plaintiff was on the Atlanta certification list, and knew that plaintiff had graduated from the CDP. While defendant is correct that CDP graduation imposes no requirement on the EEOC to non-competitively promote a graduate, graduation makes non-competitive selection possible, or even probable, as maintained by Justice Thomas, Sandate and plaintiff.

### 2. *The 1984 Non–Selections*

 In employment discrimination cases, the relevant issue for the court to

---

**56.** Defendant makes the circular argument that, because evidence establishes that only CDP graduates can be non-competitively placed, and neither Williams nor Ferguson graduated from the CDP, their placement must have been competitive. Defendant cites exhibits 190 and 195 for support of this position. Def.'s Findings, 25 n. 10. Exhibits 190 and 195 provide employment histories, including SF–171s, but do not provide any reference to specific applications to the Atlanta or Cleveland District Directorships. Thus, this evidence does not support defendant's claim. Defendant's argument does, however, support plaintiff's position that only CDP graduates could be selected non-competitively.

**57.** Admissions 69 and 70 state the following:

*Request No. 69.*
In response to the June 8, 1984 series of job announcements for District Directors positions, Harris A. Williams, later the Acting Director of the Atlanta District Office, only applied for the District Director vacancy in Atlanta.
*Response.*
Defendant denies except to admit that Harris A. Williams only appears on the list of eligible and

qualified candidates for the Atlanta District Director position announced on or about June 8, 1984.
*Request No. 70.*
In response to the June 8, 1984 series of job announcements for District Director positions, Harold Ferguson, later the Acting District Director of the Cleveland District Office, only applied for the District Director vacancy in Cleveland.
*Response.*
Defendant denies except to admit that Harold Ferguson only appears on the list of eligible and qualified candidates for the Cleveland District Director position announced on or about June 8, 1984.

**58.** Defendant admits that the evidence at trial concerning whether either Williams or Ferguson actually applied is "at least somewhat inconsistent and complicated by the fact that the Government's admission numbers 69 and 70 were problematic at best." Def.'s Findings, 25 n. 10. Further, Williams' SF–171 is incomplete, lacking educational information. (Admission Nos. 2, 5, 6; Ex. 51, 195.)

consider is the employer's motivations, not the perceptions of the applicant, or even an objective comparison of the qualifications necessary for a particular position. *Wrenn,* 808 F.2d at 502. "Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates ... So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates." *Id.* Where the position in question is management level, an employer has extensive decision-making flexibility. *Id.*

■ "A reason is legitimate for purposes of the civil rights laws if it is nondiscriminatory, even if it is mean-spirited, ill-considered, inconsistent with humane personnel policies, or otherwise objectionable." *Galbraith,* 944 F.2d at 282.

■ Defendant maintains that plaintiff's non-selection was due at least in part to his lack of service under Troy in the OPO or at headquarters in D.C. Troy argued at trial that the Deputy Director position (held by Williams and Ferguson) provided better training for a District Directorship than did the position of Regional Attorney (held by plaintiff), and that he made hiring decisions with this preference in mind. (Tr. 1256.) If plaintiff's non-selection was due to his lack of experience at headquarters, his absence of service under Troy, inadequate experience, Troy's belief that Terry lacked appropriate judgment, or even because Troy did not personally like plaintiff (which defendant does not allege),[59] the non-selection could not support a finding of discrimination or retaliation.

None of the above proffered reasons appear truthful. First, Williams did not work at headquarters or at OPO; he did work under Troy at Charlotte, but Troy's knowledge of Williams' work logically should oper-

ate against Williams' appointment, as during that time, Williams was found guilty of illegal retaliation against another EEOC employee. Ferguson neither worked at headquarters, nor under Troy. Second, Troy's stated preference for Deputy Director experience is inconsistent with his 1984 recommendation (to which he admitted on cross-examination), that the Deputy Director position be phased out and their functions assumed by Regional Attorneys. (Tr. 1257.) Third, Terry's EEOC experience was not limited to being Regional Attorney; he served as acting District Director just prior to the Atlanta and Cleveland selections. All evidence confirms that Terry was highly regarded as a capable employee, well qualified for the SES. Troy's repeated testimony that he respected plaintiff's professional capabilities is significant given Troy's extensive knowledge of plaintiff's job performance as signatory on performance evaluations of plaintiff. (Stip. 26.)

Troy had only one professional criticism of plaintiff,[60] specifically that Troy believed that Terry's vocal disagreement with the EEOC's charge processing procedures at his CDP graduation and meetings in the presence of Justice Thomas and Troy demonstrated a lack of judgment.[61] (Tr. 1058–60.) The legitimacy of Troy's view is not at issue in determining Troy's motivation. However, Bennett's view that Terry's comments were appropriate, in combination with Troy's lack of credibility and Troy's stated respect for Terry's qualifications, leads to the conclusion that plaintiff's vocal objections to the EEOC's charge processing procedures did not motivate his non-selection. (Bennett dep. 3–6.)

■ While plaintiff's superior qualifications do not in themselves constitute a violation of Title VII because management is free to choose among qualified candidates, the

---

**59.** Troy testified that, on a personal level, other than the conversation about the black baseball player, Troy was comfortable with Terry and had *no ill feelings toward him.*

**60.** As discussed *supra* n. 20 and *infra* text accompanying n. 78–81, a 1991 mid-year appraisal criticized a few cause determinations made by plaintiff. As these determinations were made well after the 1984 selections, they are not relevant to this claim.

**61.** As Region III Program Director, while in the CDP, Terry expressed to Troy and Chairman Thomas his disagreement with the EEOC's emphasis on productivity and quantity over the quality of investigations. (Tr. 107–10.) At another staff meeting with Troy, Terry asserted that, in light of *Jurgens,* white males should be included under the EEOC's affirmative action policies. (Tr. 116–17.)

imbalance in qualifications does serve as evidence that an illegal motive may have contributed to the selection or non-selection decision. Under any objective theory, plaintiff was more qualified than both Williams and Ferguson, and substantially more so in the case of Williams whom a federal judge had found in violation of Title VII, and lacking in credibility.[62] (Tr. 625–33; Ex. 163–65.) Further, at the time of the selections, Terry was the only person at the EEOC eligible for non-competitive promotion who had NLRB experience, which experience the EEOC considered in its hiring decisions. (Tr. 1267, 1279, 1286; Fleischut dep. 9–10.)

While deference should be accorded employers' selections of employees, particularly those placed in management positions, deference cannot operate to permit all management selection decisions, irrespective of evidence of illegal motivations. The totality of the evidence persuades this Court that defendant's proffered explanations are pretextual and the adverse employment actions against plaintiff were based on racial discrimination.

**62.** As District Director of Charlotte at the time of the *Cato* decision, Troy knew the terms of the finding, but never disciplined Williams, and subsequently chose to recommend Williams for promotion to the SES. (Tr. 632, 1305–06.)

**63.** Mike Reynolds was selected to the Indianapolis District Directorship. A selection is ideally made from the 'best qualified' list, not the more general list of qualified candidates. As Reynolds was not on the 'best qualified' list, his selection does not conform to standard EEOC selection procedures.

**64.** The Charlotte vacancy was withdrawn, and Ed Elkins, a CDP graduate, was non-competitively promoted to the Charlotte District Directorship. Elkins has worked at the EEOC since 1970, and had served as a supervisory program analyst in OPO before his appointment to Charlotte.

**65.** Plaintiff has established a prima facie case of discrimination as to the St. Louis selection. He applied to the position for which he was qualified, Troy knew of his application, and Lynn Bruner, a black female, was selected. (Tr. 136, 1224; Ex. 79.) However, plaintiff has not carried his burden to demonstrate that plaintiff's non-selection was motivated by discrimination or retaliation.
Troy stated that Terry was not selected for the St. Louis Directorship because St. Louis did not experience legal difficulties similar to those in

### D. Claim 2, The Indianapolis, Charlotte, St. Louis and Philadelphia Selections

■ In assessing plaintiff's second claim, the Court examines evidence presented at trial regarding the motivations behind the 1986 offer of the Detroit District Directorship, and the motivations behind the cancellations of the Indianapolis District Directorship in particular. A finding of discrimination or retaliation is a finding based on the totality of the evidence. *Ford*, 703 F.Supp. 1296.

■ Plaintiff has not established a prima facie case of discrimination as to the Indianapolis[63] or Charlotte[64] District Directorships, to which white males were appointed. Insufficient evidence exists regarding the St. Louis and Philadelphia positions to support a finding of race discrimination or retaliation.[65]

■ However, plaintiff has demonstrated a prima facie claim of retaliation as to Indianapolis and Charlotte. The evidence is uncontroverted that, by March 1985 (before all selections considered in this section),

the Detroit office, where Terry's skills were needed. Justice Thomas testified that the St. Louis and Detroit offices experienced similar difficulties. (Thomas dep. 50.) Thus, applying Troy's reasoning concerning the Detroit offer to plaintiff, the St. Louis Directorship appears ideally suited for plaintiff. Further, Bruner's appointment is somewhat questionable, as she had two 'subpar' performance evaluations over the course of three years. (Thomas dep. 98–99.) Defendant does not address the St. Louis selection in Def.'s Findings, except to acknowledge that the record is silent as to Bruner's qualifications. Although questions surround plaintiff's non-selection and Bruner's selection, plaintiff failed to present evidence concerning the vacancy cancellation (if any), the process by which Bruner was selected, or the extent of Bruner's qualifications for the office.
Plaintiff's SF–171 demonstrates that he applied for the Philadelphia District Directorship. Plaintiff, Hadfield, and Blumenthal recall the vacancy. (Tr. 140–44, 1616–19; Hadfield dep. 15–16.) On the other hand, Troy and Justice Thomas testified that the position was never vacant and that Johnny Butler, a black male, was District Director of Philadelphia at that time, but was temporarily detailed elsewhere. (Tr. 1120–21; Thomas dep. 79–80.) As the evidence is unclear as to whether the position was actually vacant at the time of plaintiff's application, plaintiff has not carried his burden, and his Title VII claim as to the Philadelphia selection fails.

Troy knew that plaintiff had filed a formal charge of discrimination against the EEOC. (Tr. 1195–98, 1202; Ex. 3.) Sandate's 1986 conversation with Troy regarding settling plaintiff's Title VII claims establishes a direct connection between Terry's protected activity and SES selections. On cross-examination Troy stated that Terry's refusal of Detroit and his filing of a discrimination complaint based on the Memphis selection were disagreements with management; in other testimony Troy stated that he did not look favorably upon persons who had conflicts with management decisions. (Tr. 1254–55.)

### 1. The Detroit Offer

■ On February 19, 1986, plaintiff was offered the Detroit Directorship, and on February 24, 1986, plaintiff refused the offer. (Ex. 97–98.) The Detroit offer provides evidence of defendant's motivations with respect to subsequent non-selections.

The question presented by the Detroit offer and refusal is whether the offer was contrived by Troy or any other EEOC selecting official, in full knowledge that plaintiff would turn down the offer, for the purpose of creating a legitimate non-discriminatory reason or excuse for plaintiff's non-selection for future SES vacancies. Defendant now argues only that plaintiff's refusal impacted non-competitive selections.[66] As plaintiff applied for all positions covered by this claim, his refusal cannot satisfy defendant's burden of production as to plaintiff's non-selection pursuant to competitive placement.

Troy stated that he did not recall Sandate informing him of Terry's disinterest in Detroit. The credible testimony, however, was given by Sandate. Sandate testified that he specifically repeated his conversation with Terry to Troy. Thus, Troy knew Detroit was the one SES vacancy Terry did not want.[67] Moreover, Bennett testified that had he known about Terry's discussion with Sandate and about Troy's knowledge of that discussion, he would not have made Terry the offer of the Detroit Directorship because he would have viewed the offer as one made in bad faith and constituting a "ruse." (Tr. 457–59.)

Defendant argues that, even if Troy was aware of Terry's expressed disinterest in Detroit, the appointment was appropriate because employee placement desires do not determine selections. According to Troy, placement decisions rest primarily on where an employee's skills would be most useful to the agency, and any personal preferences are at most secondary and usually outweighed. Lack of consideration for plaintiff's personal desires does not constitute a violation of Title VII. *Galbraith*, 944 F.2d at 282. Nonetheless, lack of consideration does raise concerns about motivation, particularly where, as in this case, the lack of consideration for an employee's preferences is unusual. The EEOC did not move most SES managers, the OPM handbook does not require all SES members to be mobile, and on several occasions, the EEOC actively accommodated the desires of EEOC managers requesting certain geographical placements for personal reasons.[68] (Tr. 1237–42; Ex. 29.) Addition-

66. Defendant maintains that, after plaintiff rejected the Detroit offer, it was not unreasonable for the agency to assume that plaintiff would apply for the jobs in which he was interested and that, if he did not do so, he did not desire the particular job. Troy testified that plaintiff's rejection of the offer demonstrated an absence of the flexibility desirable in SES officers; but at deposition, stated that the rejection had no impact on selection decisions concerning plaintiff. (Tr. 1247–49.) The key question for this case is not which testimony is truthful, but whether the offer was made in good faith.

67. Regarding the issue of pay, the evidence shows that the amount offered plaintiff was reasonable. However, Troy had the authority to ask

the Chairman for whatever pay level he desired, and Troy's statement that he did not appoint persons to the SES above a level of ES–4 was contradicted by evidence that Esquivel was appointed at a level of ES–5. (Tr. 1232–33.)

68. For instance, Spencer Lewis, a black male, requested and received a transfer from Detroit to New York. Lewis wanted to be closer to his family. (Tr. 1237.) Similarly, when testifying about the 1991 SES selections, Troy explained how, as favors, the EEOC transferred Issie Jenkins, a black female, and transferred Roggerson, a black male; in addition, defendant appointed Marsh Drane, a black female, who had previously been granted leave to resolve personal matters. (Tr. 1141–47.) All were placed in SES positions.

ally, Blumenthal was considered for several SES positions, and her refusal had no apparent impact on her later promotion to a high level SES job. (Tr. 1628–29.)

Relying on Troy's testimony, defendant also argues that Terry was an ideal choice for the Detroit Directorship because Terry was a CDP graduate, had served in a highly effective manner as acting District Director, and was a skilled lawyer, of which Detroit had particular need.[69] (Tr. 1127–29, 1242–45.) In the context of plaintiff's repeated failure to obtain any SES appointment other than Detroit, Troy's statement makes suspect Terry's non-selection to other SES positions. Similarly, Troy's statement that Detroit was unique in its need for a lawyer to fill the Directorship is not credible, as subsequent offers were made to non-lawyers.[70] Bennett left the EEOC rather than accept an involuntary transfer to Detroit, confirming Dupre and Muse's testimony that Detroit was one of the least desired placements in the EEOC. (Tr. 462–63; Dupre dep. 42; Muse dep. 84.) Further, while the offer of an ES–4 was reasonable, and consistent with EEOC policy,[71] Bennett found Terry's request for a higher salary reasonable, and Troy had the authority to offer plaintiff an ES–5.[72] (Tr. 1226–28.)

Finally, it is not credible that Troy had no knowledge of the 1982 *Ford Motor Company* decision[73] at the time he offered plaintiff Detroit. Troy had extensive experience with Title VII claims, had supervised settlement investigation of all internal EEO charges, wrote cause determinations for the EEOC,

and participated in closed sessions during which the Commission votes on whether to bring a suit under Title VII. (Tr. 1173–75, 1327.) Testimony by Bennett, Grabon, Muse and Dupre show that Troy did not hesitate to transfer and appoint persons to various positions with the aim of achieving his desired goal, including causing that person to leave the EEOC. (Tr. 463–67, 1828–33; Muse dep. 74–84; Dupre dep. 43–44.)

For all the above reasons, the Court finds that the Detroit District Director offer was made in bad faith.

### 2. *The Cancellations*

■ On February 20, 1986, plaintiff applied for the Indianapolis vacancy, which was subsequently cancelled. On December 4, 1986, plaintiff applied for the Indianapolis District Directorship, pursuant to a second vacancy announcement. This vacancy was also cancelled. By the time a third vacancy was announced on May 8, 1987, plaintiff believed any application would be futile and did not apply again. (Tr. 160–61.) On November 25, 1985, plaintiff submitted an SF–171 stating his interest in the District Director vacancies in St. Louis, Charlotte, Philadelphia, and "other" SES positions. (Stip. 50; Tr. 135–38; Ex. 79.) The Charlotte and St. Louis vacancies were subsequently cancelled. (Tr. 155.)

As a threshold matter, defendant argues that application to the third Indianapolis vacancy was not futile. The doctrine of futility applies where the employer's practice is gross and pervasive. *See e.g., Teamsters,*

---

**69.** Based on Detroit's need for someone with strong legal skills, and plaintiff's interest in an SES appointment, Bennett thought the offer was a good opportunity for plaintiff and the EEOC. (Tr. 500.) Bennett could not recall whether Troy originated the idea of placing Terry in Detroit. (Tr. 454.)

**70.** Upon Terry's refusal, the Detroit Directorship was offered to Joe Wiley; when Wiley left the position, Bennett was involuntarily transferred to Detroit. (Tr. 459, 462–63, 1246.)

**71.** Patricia Johnson, Director of the Human Resources Management, testified that salary levels for new SES members are constrained by two conflicting policy goals: the agency seeks to start new SESers at an ES–1 or ES–2, but also tries to

give a six percent salary increase. (Tr. 2014–15.) Plaintiff's long tenure as a GS–15 meant that an ES–1 or ES–2 would result in a reduction in pay, but a six percent increase would have required an ES–6, the highest pay level, which was inappropriate for a new SESer. (*Id.*)

**72.** For example, Joyce Bradley went from a GS–14 to an ES–5, and Pedro Esquivel was promoted from a GS–15 to an ES–5. (Tr. 1232–33.) *OPM guidelines allowed the Commission to pay at a level higher than ES–4.* (Tr. 1226; Ex. 29.) However, an ES–4 placement was reasonable, and Blumenthal testified that, upon her first SES selection, she was offered an ES–3 position. (Tr. 1584.)

**73.** *See supra,* n. 30.

431 U.S. at 367, 97 S.Ct. at 1870–71. Considering the plethora of SES vacancy cancellations covered by this claim alone, and Troy's history of cancelling vacancies when he disliked those on the certification list, the Court agrees with plaintiff that reapplication was futile. Nonetheless, the Court's finding does not turn on futility because, during the period in question, plaintiff was eligible for noncompetitive selection.

The EEOC may cancel vacancy announcements for a number of reasons, including budget considerations, staffing factors, and training opportunities. (Tr. 1077–79, 1422.) The motivation behind a vacancy cancellation determines whether the agency's action violates Title VII. Defendant argues that the first Indianapolis vacancy was cancelled to provide headquarters personnel with field experience, and the second was cancelled so that Dupre could be reassigned from headquarters to Indianapolis. (Tr. 1121–22.) Defendant also maintains that Troy was not aware that plaintiff had applied for either vacancy. (Tr. 1121–23.)

The evidence does not support these contentions. First, the initial vacancy for Indianapolis lasted for a total of two years during which headquarters personnel served no more than six months in total as acting District Directors. (Vlantis dep. 8–11.) Second, the announcement of the vacancy for a second time is inconsistent with an EEOC goal to place headquarters personnel in temporary positions in that office. (Tr. 1122.) Third, Dupre resigned from the EEOC two months before the second vacancy was cancelled and thus, could not be the reason for its cancellation. (Dupre dep. 46.)

All explanations proffered by defendant are pretextual. The Court holds that the bad faith offer of Detroit coupled particularly with the Indianapolis vacancy cancellations

following plaintiff's applications indicates that defendant offered and withdrew positions in illegal retaliation against plaintiff.[74]

### E. Claim Three, Seattle, Atlanta and Charlotte

Plaintiff's five year certification for noncompetitive placement expired on June 27, 1988. Plaintiff applied for the Seattle, Charlotte and Atlanta District Directorships after this period, and therefore was eligible only for competitive selection to these positions.

As determined in the previous claims, Troy had knowledge by 1985 that plaintiff had raised complaints against the EEOC; by 1988 (if not earlier), Troy knew that plaintiff had named him specifically as a discriminating official. (Tr. 1195–1203; Ex. 1, 3, 14.) Kemp, newly appointed as Chairman of the EEOC, also knew of plaintiff's complaints against the EEOC because Terry wrote to Chairman Kemp in 1990, attempting to resolve his EEO complaints. (Tr. 178–79, 185–86; Ex. 8, 9.)

Again, in determining these and other claims raised by plaintiff, the Court examines the totality of the evidence, evaluating each non-selection in the context of other selection decisions since Terry's employment at the EEOC. The Court's discussion as to this claim focuses on the Seattle and Charlotte District Directorships.[75]

Plaintiff has established a prima facie case of race and sex discrimination as to his non-selection for the Charlotte District Directorship. On April 17, 1991, Terry applied to the Charlotte District Directorship, and on May 14, 1991, ERB submitted to Troy a certificate of eligibles containing plaintiff's name. (Ex. 72, 73.) The position was subsequently cancelled, and on June 18, 1991, Troy

---

**74.** Regarding the 1985 Charlotte position, Troy testified that he was not aware that plaintiff could be non-competitively selected without applying for these positions; as with the 1984 claims, this argument is specious. Because Elkins was a *Jurgens* class member, the evidence of retaliation is less strong than with other selections at issue in this case; but unlike plaintiff, Elkins did not raise other EEO claims of discrimination, specifically claims against selections made by Troy personally. Further, the Charlotte

cancellation is significant because it provides another example of a position that was cancelled after plaintiff applied for the vacancy. Defendant has offered no reason for the cancellation of the Charlotte vacancy.

**75.** As the evidence is unclear whether the Atlanta District Directorship was open to competitive selection in 1991, plaintiff fails as to this portion of his claim. (Ex. 96.)

recommended Marsha Drane, a black female, who was appointed to the position. (Ex. 96.)

■ Plaintiff has established a prima facie case of sex discrimination for the Seattle position. He applied for and was qualified for the position, and a white female was appointed. (Ex. 95.) In 1987, Leino held only a GS–12 and as such was ineligible for SES selection. (Muse dep. 33–36.) That year, the Seattle District Director position was downgraded from an SES position to a GS–15 position in order to allow for Leino's selection in 1988. (Muse dep. 34–35.) In 1991, Kemp approved the upgrade of the Seattle position to an SES level, at which time both plaintiff and Leino were eligible and applied for the job, and both were placed on the certification list. (Tr. 1349.) On July 24, 1991, Troy recommended Leino as District Director of the Seattle EEOC office. (Ex. 89.)

■ Defendant satisfied its burden of production by articulating a legitimate non-discriminatory reason for Leino's selection; namely, her record as a manager of the Seattle office who could perform her job in a highly effective manner. Plaintiff argues that he had a greater range and length of experience than Leino at the time of her selection, which contention is supported by the higher rating given to plaintiff than to Leino by the Seattle District Director Ratings Panel. (Admission No. 24.) Nonetheless, Leino's experience in the Seattle office makes her well-qualified for the position, and defendant is not required to select the most objectively qualified candidate. (Ex. 94; *Wrenn*, 808 F.2d at 502.) The issue for this Court is whether her qualifications motivated her appointment, or whether illegal motivations were behind plaintiff's non-selection.

At trial, Troy attempted to distance himself from any responsibility for the Seattle appointment, testifying that Choate screened the applications for Seattle and selected Leino; he testified that he simply approved Leino's recommendation. (Tr. 1136.) Troy then contradicted his direct testimony, stating on cross-examination that he considered plaintiff for the position, but concluded that Leino was the best person for the job given her three years of experience in Seattle.

(Tr. 1349.) Similarly, Choate contradicted Troy, stating she made no recommendations concerning the Seattle selection. (Choate dep. 5–7.)

The initial downgrade and subsequent upgrade of the Seattle District Directorship to secure the placement of Leino is another example of Troy's control over selections, to maneuver the placement and non-placement of certain individuals. Also, as discussed above, Troy was impeached at trial with his testimony in *Cole*, in which he admitted cancelling the Charlotte District Director vacancy after the certificate of eligibles with plaintiff's name was produced. (Tr. 1335–39.) By reassigning a present SES official (Marsha Drane), Troy could circumvent the entire certificate of eligibles review, and thus, plaintiff's application. Defendant does not explain the reason for the Charlotte vacancy cancellation, except to deny that Troy knew that plaintiff's name was on the certification list for Charlotte. As discussed above, this testimony is not credible and is contradicted by Troy's own testimony.

In the context of all evidence presented in this case, the evidence regarding the Seattle and Charlotte District Director selection supports plaintiff's claim of discrimination and retaliation. While the evidence is not so clear that the Court can conclude with certainty that the adverse employment action occurred only from race discrimination, from sex discrimination, or from illegal retaliation, independently, the totality of all the evidence, direct and circumstantial, persuades the Court that the adverse employment actions against the plaintiff were based on a combination of reasons based on race, gender, and retaliation. *See Few v. Yellow Freight System*, 1986 WL 6871, *12 (N.D.Ohio 1986).

## F. Claim Four, Deputy General Counsel

■ In 1992, Terry and Neely both applied for the SES position of Deputy General Counsel, and Neely was selected. Plaintiff has established a prima facie case of discrimination and retaliation. As to his race discrimination claim, plaintiff applied, was qualified, and a black male was appointed. As to his retaliation claim, Livingston knew that

plaintiff had raised claims against the agency, and he found Terry's present claim against the EEOC demonstrated a lack of judgment. Livingston discussed Terry's rejection of the Detroit Directorship with Phillip Sklover, Associate General Counsel for Appellate Services Division, and with Troy, with whom Livingston had a close working relationship (speaking on average twice a day). (Livingston dep. 65, 72–76.) At the time he recommended Neely for the Deputy General Counsel position, Livingston was aware that Terry had race discrimination charges pending against the EEOC, and testified that he probably discussed these claims with Troy.[76] (Id. at 64, 75, 127.)

▮▮▮ Defendant argues that, although Livingston felt Neely and plaintiff had comparable qualifications, Livingston was more comfortable with the judgment of Neely than with that of plaintiff, and consequently selected Neely for acting Deputy General Counsel and for Deputy General Counsel. (Id. at 109–10.) Specifically, Livingston testified that he and plaintiff had different legal perspectives and analyses of two cases, Mead and Northwest Airlines.[77] (Id. at 113, 115, 120, 124.) This argument carries defendant's burden of production, and plaintiff must show the proffered reason is pretextual for his claim to succeed. In determining whether this proffer is pretextual, the Court examines two issues: whether Livingston's disagreement with plaintiff's judgment motivated plaintiff's non-selection, and whether Neely's earlier appointment as acting Deputy General Counsel is evidence of preselection, structured to make Neely the more qualified of the candidates.

▮▮▮ Evidence of preselection operates to discredit the employer's proffered explanation for the decision. Goostree v. State of Tennessee, 796 F.2d 854, 861 (6th Cir.1986), cert. denied, 480 U.S. 918, 107 S.Ct. 1374, 94 L.Ed.2d 689 (1987). A finding of preselection is relevant to the issue of whether defendant's motivation was illegal pursuant to Title VII. Id. Only an illegal motivation will support a finding that Title VII has been violated. An employer's discretion to chose among qualified candidates is not diminished by Title VII, especially in connection with selecting management level employees. Wrenn v. Gould, 808 F.2d at 502. At the same time, when, as in this case, the decision is subjective, the legitimacy of the articulated reasons for the employment decision is subject to particularly close scrutiny. Grano v. Dept. of Dev. of City of Columbus, 699 F.2d 836, 837 (6th Cir.1983.)

▮▮▮ The Court first considers evidence regarding Livingston's disagreement with plaintiff's judgment. Livingston testified that his discomfort with plaintiff's judgment emanated from plaintiff's case submissions, referenced in plaintiff's 1991 interim appraisal. The appraisal criticizes plaintiff's cause recommendations,[78] citing one case submission, Mead, by name.[79] (Ex. 76.) Livingston

76. By October 28, 1991 (over one month before Neely appointment to acting Deputy General Counsel on December 5, 1991), Troy knew Terry had brought an EEOC claim regarding his non-selection in Seattle, Atlanta and Charlotte. (Tr. 1348.) Given Livingston's supervisory position over plaintiff, and frequent communication with Troy, it is reasonable to conclude that Livingston also had knowledge of these particular allegations.

77. Livingston stated that he thought, but was not sure, that he also disagreed with a third cause determination made by plaintiff. Livingston could not recall the name of the case, except that it involved an age discrimination claim. (Livingston dep. 123–24.)

78. Dispute exists as to who is responsible for including this critical language in the 1991 appraisal. Sklover testified that he believed the language was included at Livingston's request,

and could not specifically recall including it himself. (Tr. 1690.) In response to Grabon's objection to the criticism of Terry, Livingston told Grabon that Sklover was responsible for the language, but also stated that plaintiff had mishandled Mead. (Tr. 1834–35.) Livingston testified that he did not recall directing Sklover to include the criticism of plaintiff. (Livingston dep. 141, 144.) For the purposes of this case, it is immaterial who wrote the language, as it is clear that Livingston agreed with its content.

79. Mead involved a claim for retaliatory discharge in violation of Title VII, brought by Deborah Thacker, a black female employee of Mead Corporation. Thacker was fired for "dishonesty." Specifically, her employer found that, prior to taking a test required by the company for admission to an apprenticeship program, Thacker improperly received information about the test.

felt that plaintiff should not have recommended that the EEOC litigate either *Mead* or *Northwest Airlines*.[80] At times in his deposition testimony, Livingston portrayed the cause determination disagreement as one based on purely subjective judgment, not as a reflection on Terry's abilities.[81] At other times in his testimony, Livingston portrayed Terry as an objectively inferior decision-maker; for instance, Livingston expressed his disapproval of plaintiff's present suit, stating that his impression of discomfort and disagreement with plaintiff's judgement was validated by plaintiff's decision to pursue a claim against the EEOC concerning the Deputy General Counsel position.[82] (Livingston dep. 125.) Livingston's comment about the current litigation also supports plaintiff's claim of illegal retaliation.

Grabon and a federal judge agreed with plaintiff's assessment of *Mead;* Grabon and Carson Owen, Senior Trial Attorney with the EEOC, agreed with plaintiff's assessment in *Northwest.* (Tr. 401–16, 2073; Ex. 170, 170A, 170B.) Although Terry's position was supported by persons in authority knowl-

Terry recommended, and Grabon concurred, that the EEOC litigate *Mead*. Livingston disagreed with this recommendation, and the EEOC did not pursue the claim on behalf of the plaintiff. A federal district court subsequently denied defendant Mead's motion for summary judgment, stating, "the facts give rise to a strong inference of retaliatory discharge despite Mead's proffered reasons for terminating Ms. Thacker's employment." Plaintiff subsequently received a large settlement in the case. (Ex. 170, 170A, 170B.)

80. *Northwest Airlines* involved an employee's request for a temporary restraining order enjoining the employer from impeding his religious worship (Satanism) during work hours, and from loss of health benefits upon termination. Plaintiff and Grabon supported pursuing the charging party's claim. Livingston disagreed, and the EEOC did not litigate the matter. (T. 2067–73; Livingston dep. 122–23.) Carson Owen, Senior Trial Attorney with the EEOC, reviewed Livingston's deposition prior to testifying. At trial, Owen was asked about this testimony, as it pertained to *Northwest Airlines,*

A: ... [I]t basically was saying that part of it was he felt that this was—well, he mischaracterized the facts, I noticed that, first off, in terms of what had happened and what had been done. He said that he—he said that there was profound disagreement about whether this was a case that the government should be expending resources on litigating, and he also said that part of the disagreement about whether this was a case that we felt we just made the recommendation or that Ray had made the recommendation without sufficient knowledge of what the man had done, and I disagreed with that strongly when I read it. One of the things that had seemed very disturbing to me at the time, or the most disturbing was Mr. Sklover's comment about Mr. Livingston just not being willing to approve the case, but the other thing was that we seemed to have such intense concern for the content of the book placed in the room by the charging party, but no concern was voiced at all about the content of the books that the employer al-

lowed the Christian employees to place in the room, it was sort of like to me a discriminatory attitude, a reflection of a discriminatory attitude toward a man's religion, focusing on what his book said, but with no concern about what these other books said that were allowed to be placed in the room.

Q: The facts as related by Mr. Livingston about that case, would it be fair to say that those facts did not accurately reflect the facts that this commission office found and that you were basing your recommendation on?

A: In my opinion, that would be correct.

81. For instance, he testified,

Were there some litigation recommendations that Ray made that I thought were ... inconsistent with my judgment on whether we should pursue litigation? There were, as there were with all the offices. There were a couple where I, our disagreements were fairly sharp. (Livingston dep. 35.)

I'm not taking issue with Ray's judgment. It's a question of being comfortable with the judgment and whether it's consistent with, with my own because of the delegation factor and the advisory factor and all the other various hand and glove type roles that the deputy general counsel is going to play with the general counsel.

(*Id.* at 181–82.)

82. At deposition, Livingston gave the following testimony:

Q: Well, are there any other cases today that you can tell us about? ...

A: Which would support the judgment that I made? Is that the question? ...

Q: Yeah. Terry versus EEOC I think demonstrates precisely the point that I'm making. I think it's, I think that the legal judgment that he is making to include the decision to select Neely over him is sufficiently weak and weakens his overall case, that I sleep well at night knowing that I probably made the right decision with respect to Jim Neely because I think it's very bad legal judgment. (Livingston dep. 125.)

edgeable about the case, only plaintiff, and not Grabon, was criticized for the submissions. (Tr. 404.) In addition, Neely's record was not without difficulties. He had performed poorly in preparing a report for Congress (leaving Livingston to complete the assignment),[83] his supervisor of four years, Lynn Bruner, was critical of his performance and did not have a strong or close working relationship with Neely,[84] and Neely received a "marginal" rating for a case recommendation in a 1989 performance evaluation.[85] These facts, in combination, raise sufficient questions about Neely's selection to warrant a close examination of plaintiff's preselection argument.

Livingston, Sklover (Neely's supervisor from 1985 to 1992, and plaintiff's supervisor from 1985 to the present), and Rowe all testified that plaintiff would make a good Deputy General Counsel. (Tr. 719–21, 1683; Livingston dep. 34.) According to Sklover, once Neely was appointed acting General Counsel, Neely was in serious contention for permanent appointment to the Deputy General Counsel position:

Q: What would be the basis for the view that you would have about that?

A: The basis, I guess, was just my experience and common sense and tenure in the job ... it's probably a fair consensus that the job was Neely's to lose. I mean clearly someone who serves in a position as an acting is basically performing that job, and if the person does that job effectively, I think the presumption is in favor of that person continuing on.

(Tr. 1691–92.) Rowe testified that the central factor considered by the rating panels was Neely's experience as acting Deputy General Counsel. (Tr. 719–21.) Had Neely not served as acting Deputy General Counsel, Rowe would have rated Terry the stronger candidate because Terry's qualifications were otherwise objectively superior. (*Id.*) Livingston did not know whether Neely would have been on the certificate of eligibles list if he had not performed as acting Deputy General Counsel. (Tr. 159.) Livingston did feel that Neely's experiences as acting Deputy General Counsel made Neely a better candidate than he had been before the appointment. (*Id.*) During Neely's period in the acting position, Livingston discussed his vision of the General Counsel's Office with Neely; he did not have similar discussions with Terry. (Tr. 159–60.)

William Bartlett, defendant's expert, defined preselection for the Court as making the employment choice before any competition for the particular position begins. (Tr. 1434.) Preselection may be shown by a com-

---

**83.** Part of Neely's responsibility as Acting Deputy Counsel was to prepare the OGC Annual Report for Congress. Livingston testified that Neely did not prepare the report adequately, particularly with respect to presentation, and Livingston had to complete the project himself. (Livingston dep. 57, 165.) Livingston characterized the report as a major responsibility of the office. He stated that, although the report submitted by Neely was equal in quality to previous reports, Livingston wanted to improve the quality of the report; by working on it himself, Livingston was able to improved the quality of the report. (*Id.* at 57–58.) Livingston further testified that Neely had not completed the report when it was due. (*Id.* at 164.)

**84.** Lynn Bruner, Neely's supervisor from 1987 to 1991, testified that she gave Neely two intermediate ratings of "fully successful." (Bruner dep. 20.) Concerning Neely's performance, she stated,

[T]here were problems in the manner in which the financial records were maintained, in the timely preparation of the delivery receipts, there were problems with proper handling of

paperwork, insofar as evaluations of employees were concerned, insofar as executing the proper paperwork for bringing law students on board. There were some labor management concerns that I had, labor relations management concerns that I had, a number of other concerns in those areas.

(Bruner dep. 17–18.) Livingston testified that although he knew that Bruner had difficulties with Neely, he did not speak to Bruner about her criticisms before appointing Neely. (Livingston dep. 96.) Sklover also was aware that Bruner did not think Neely was managing the legal unit effectively.

**85.** A mid-year evaluation of Neely rated him as "marginal" in one area:

While there is substantial adherence to the fully successful standard, the submission to the Associate General Counsel failed to identify caseload imbalances in a timely manner.

(Ex. 102.) Neely was also criticized for a lack of thorough analysis of the law. (*Id.*) This same appraisal, also included "fully successful" and "highly effective" ratings of Neely.

bination of factors which deviate from the norm, including making decisions without interviews, failing to review application materials, stacking the ratings panel with reviewers favorable to a particular candidate, and appointing a candidate to the position on an acting basis. (Tr. 1434–35, 1438–41, 1447–48.) These factors are all present in this case.

Specifically, Livingston did not consult with either Bruner or Sklover, both of whom had supervised Neely, before selecting Neely for either the acting or the permanent Deputy General Counsel position. (Tr. 1668, 1690, 1695; Livingston dep. 101, 178.) Sklover testified that it was not normal procedure to make such an appointment without consulting that person's supervisor. (Tr. 1668.) Livingston also did not conduct interviews for the position. (Tr. 353.) Rowe, who considered Neely his best friend at the agency (which friendship was well known throughout the EEOC), was selected as a member of the Deputy General Counsel ratings panel. This was his first and only appointment to a ratings panel. (Tr. 705–07.)

Rowe testified that at the time Livingston appointed Neely acting Deputy General Counsel, the general view at the EEOC was that Livingston, a white male, needed to appoint a minority since he had just removed two minority Associate General Counsels. (Tr. 711.) Rowe stated that Neely believed race to be a factor in his selection. (*Id.*).

The Court finds that this evidence of race-based selection, Livingston's failure to consult Neely's immediate supervisors about Neely's qualifications (particularly in light some concerns with Neely's record), Rowe's placement on the selection panel,[86] and evidence that EEOC officials maneuvered vacancies and appointments to place and displace employees, demonstrates preselection. Preselection operates to discredit plaintiff's proffered reasons for Neely's selection as acting Deputy General Counsel. For the

above reasons, the Court finds that defendant discriminated and retaliated against plaintiff in violation of Title VII as to plaintiff's fourth claim.

## IV. REMEDIES

■ "Federal agencies such as defendant EEOC are under a particularly compelling mandate to adhere strictly to the requirements of Title VII." *Berio v. EEOC,* 1979 WL 127, *6 (D.D.C.1979.) When the agency fails to meet the standards and values in which it has been entrusted, and violates Title VII, the statute provides for back pay and other equitable relief to be given by the discriminatory employer [87] to the victim of illegal discrimination. Relief under Title VII is structured to achieve the following purpose:

> [T]o make the victims of unlawful discrimination whole, … the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of, but also requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination.

*Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (citing 118 Cong.Rec. 7168 (1972)).

■ The following categories of relief are necessary in order to remedy the Title VII violations by the EEOC in this case: (1) placement in the SES; (2) compensatory damages; (3) reimbursement of medical expenses and payment of medical expenses for the upcoming year; (4) injunctive relief; (5) reasonable attorney's fees and expenses; and (6) back pay, bonuses, and benefits. As set forth below, this Opinion awards plaintiff all the above forms of relief, except back pay, bonuses and benefits.

---

**86.** Defendant reasonably argues that Livingston had no need to interview the candidates, as he knew Terry and Neely personally; thus the absence of interviewing does not factor into the Court's finding of preselection.

**87.** Defendant Equal Employment Opportunity Commission is liable in this matter. Troy resigned as Director of OPO on February 13, 1995, and is now deceased. Therefore, it is unnecessary to determine what remedial action would have been appropriate as to him.

The question of back pay, bonuses and benefits is referred by separate Order of Reference for a settlement conference, to allow consideration of additional salary, bonus, and benefit information for the period between trial and the date of entry of this Opinion.

### A. Damages Awarded Plaintiff

#### 1. Placement in the SES

It is ORDERED that the defendant Equal Employment Opportunity Commission shall place plaintiff in an SES position. If the parties are unable to agree on an appropriate SES position, then plaintiff shall choose one of the next three SES vacancies.[88] To facilitate this remedy, defendant is hereby ENJOINED from placing any person in an SES position on an acting basis without first giving plaintiff the opportunity to fill the position on a permanent basis. Moreover, defendant is ENJOINED from placing any person in an SES vacancy by reassignment from the SES or by non-competitive placement, without first offering the vacancy to plaintiff.[89]

From the date of this Opinion until plaintiff's placement in the SES, plaintiff shall be paid as an SES officer, at a rate of an ES–6. Plaintiff should be placed into the SES at an ES–6 level when a position becomes available. Given that plaintiff was offered an ES–4 for the Detroit Directorship, and calculating a reasonable pay increase for plaintiff, placement at an ES–6 level is appropriate.[90]

During the interim period between the Court's Opinion and his placement in the SES, plaintiff shall receive all benefits and bonuses that would be issued to him as a member of the SES.[91]

#### 2. Compensatory Damages

The Civil Rights Act was amended in 1991, to allow compensatory damages under Title VII for violations occurring after 1991. Under Section 102(b), Entitled, "Damages in Cases of Intentional Discrimination," a Title VII plaintiff who wins a back pay award may also seek compensation for such damages as emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses. 42 U.S.C. § 1981a(a), as added by § 102 of the 1991 Act; *Landgraf v. U.S.I. Film Prods,* 511 U.S. 244, ——, 128 L.Ed.2d 229, 114 S.Ct. 1483, 1491 (1994).

Terry, his wife and his daughter all testified that plaintiff suffered from emotional distress, embarrassment, pain and loss of enjoyment of life as a result of being denied the position of Deputy General Counsel, which application and denial occurred after 1991. (Tr. 270–76.) Plaintiff's non-selection to this position (the final layer in a series of non-selections) led to physical manifestations of stress, such as insomnia and tension, and negatively impacted his relationship with his family. (Tr. 271, 275.) Terry's wife, Louise, testified that plaintiff was dedicated, on a personal and professional level, to achieving

---

**88.** Plaintiff's extensive experience at the EEOC renders him qualified for a variety of SES positions. Defendant argues that any placement of plaintiff should be limited to those positions for which he is technically qualified, but defendant does not give examples of an SES position requiring qualifications that plaintiff does not possess. In the event that defendant offers plaintiff only appointments requiring some qualification outside plaintiff's expertise, plaintiff may notify the Court and seek modification of this Order to allow selection to an appropriate SES position.

**89.** For purposes of Terry's placement in the SES, his OPM certification status is irrelevant. Defendant cannot argue that plaintiff has not received an SES appointment because certain positions were only open to noncompetitive placement. Plaintiff shall have the choice of *any* SES position that becomes vacant.

**90.** As discussed below, step increases for plaintiff shall be determined by settlement conference between the parties. However, it is clear from Johnson's testimony and exhibits introduced in this case, that plaintiff would have attained an ES–6 level by the time of this Court's judgment, approximately 12 years after the EEOC discriminated against him as to the Atlanta District Director selection.

**91.** The precise amount of the bonuses and benefits that plaintiff shall be awarded to cover the interim period shall be determined at the time of his appointment to the SES. The bonus amount shall be derived by taking the average of the bonuses awarded to SES officers for the months making up plaintiff's interim period. The parties shall submit a figure to the Court for approval. Alternatively, the parties may, of course, choose to set a precise figure to cover interim period bonuses and benefits at settlement.

and enforcing racial equality and civil rights, and that his non-selection to the SES seriously impacted his psychological health. (Tr. 528, 537, 551.) Plaintiff's daughter gave similar testimony. (Tr. 755–59.)

Dr. Randy Dupont, plaintiff's psychologist, testified that plaintiff suffered from post-traumatic stress disorder, which condition was caused by his repeated non-selection to the SES. (Tr. 801, 845, 867–68.) Even assuming, as defendant claims, that plaintiff does not suffer from post-traumatic stress disorder, it is uncontroverted, including by defendant's own expert, that plaintiff suffered emotional distress, anxiety and depression as a result of being denied promotion to the SES.[92] (Tr. 1737–40, 1767–69, 1911.)

Since 1991, plaintiff has suffered significant emotional pain, suffering, stress, loss of enjoyment of life, and detrimental impact on his career. Therefore, the Court awards plaintiff compensation for those injuries in the amount of $150,000.00.[93]

### 3. *Medical Expenses*

Dr. Dupont became plaintiff's treating professional on February 24, 1993, and continued to treat plaintiff throughout the trial. (Tr. 788; Ex. 199.) Defendant is ordered to reimburse plaintiff's expenses for this care, and to pay for future treatment of plaintiff for one year after the Court's Opinion, at the same rate and frequency as his present treatment. Plaintiff's medical expenses up through August 31, 1994, are $3,098.14. (Ex. 199.) Plaintiff's medical expenses from September 1, 1994, through April 31, 1997, are calculated at Dr. Dupont's rate of $90.00 an hour, for two one-hour sessions per month (plaintiff's standard course of treatment). (Ex. 199A.) Accordingly, defendant is ORDERED to pay plaintiff a total of $8,858.14 to cover medical expenses.

### 4. *Injunctive Relief*

Defendant is ENJOINED from discriminating and retaliating against plaintiff. *See Butler v. Coral Volkswagen, Inc.,* 629 F.Supp. 1034, 1041 (S.D.Fla.1986) (court enjoined defendant from discriminating against blacks, and specifically against the plaintiff in that matter, on the basis of race).

A copy of this Opinion shall be distributed to all SES incumbents, and posted at EEOC headquarters and at each of defendant's district offices.[94]

### 5. *Attorney's Fees and Expenses*

The Court finds that plaintiff is the prevailing party in this matter. Plaintiff's counsel is instructed to submit evidence in support of an award for reasonable attorney's fees and expenses within 30 days of entry of the Court's Opinion.

### B. *Settlement Conference Ordered*

■■■ The Civil Rights Act provides for back pay awards:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may ... order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or person discriminated against shall operate to reduce the back pay otherwise allowable.

Civil Rights Act of 1964, § 706(g), as amended, 42 U.S.C. § 2000e–5(g). Victorious Title

> The Court should order that a copy of its Findings and Conclusions, and Order, be sent to all EEOC SES incumbents to read, and that a summary be posted at EEOC headquarters and each of defendant's district offices.
>
> (Pl.'s Findings, 45.)

---

**92.** Defendant's expert, Dr. Joel Reisman, testified to this effect, and his subsequent recantation was effectively impeached. (Tr. 1766–70.)

**93.** No award, of course, is available for injuries prior to 1991, pursuant to 42 U.S.C. § 1981a(a).

**94.** This Order is made at the specific request of plaintiff:

VII plaintiffs are presumptively entitled to back pay until the date the judgement is entered in the case. *Shore v. Federal Express,* 777 F.2d 1155 (6th Cir.1985).

■■■ Back pay awards should completely redress the economic injury claimant has suffered as a result of the discrimination. *Rasimas v. Michigan Dept. of Mental Health,* 714 F.2d 614, 626 (6th Cir.1983). These losses extend beyond salary, including the following economic loss: (1) sick leave; (2) annual leave; (3) profit sharing; (4) pension contribution; and (5) bonuses.

■■■ Plaintiff shall receive back pay, retroactive to the first claim for which defendant is found in violation of Title VII, i.e., the Atlanta District Director selection on November 11, 1984. (Ex. 195, 221.) By agreement of both parties, the initial rate of back pay in salary shall be calculated by subtracting plaintiff's actual pay as a GS–15 from the pay for an ES–4 in Atlanta in 1984.[95]

The parties dispute the appropriate step increases to award plaintiff. Plaintiff argues that he should receive a step increase each year subsequent to the first year concerning which the Court finds discrimination (culminating in an ES–6). Defendant argues that plaintiff's salary should be set at an ES–4 until 1991, and thereafter, be set at an ES–1. Defendant maintains that the ES–1 level is

appropriate because, in January 1991, EEOC employees received a twenty-five percent pay raise, putting the ES–1 salary significantly above plaintiff's non-SES salary at that time.[96] It does not follow that the 1991 pay increase warrants a reduction in plaintiff's SES rank. Defendant illegally discriminated against plaintiff on the basis of race from 1984; accordingly, plaintiff's salary should be computed with increases calculated from that period. Defendant does not submit any suggestion to the Court concerning appropriate step *increases* for plaintiff.

Increases in pay levels are dependent upon the individual SES officer's performance, and are not standard increases.[97] (Tr. 2022.) As Terry's performance evaluations have all been within the "outstanding" or "highly effective" category, it is reasonable to conclude that he would receive periodic step increases.

While the Court has sufficient evidence to reach an appropriate figure for a back pay award for plaintiff, due to the passage of time between the presentation of evidence and final arguments, and the Court's Opinion, the parties are directed to settlement conference before United States Magistrate Judge Allen to be conducted within thirty days after the entry of this Opinion.[98]

Settlement negotiations shall proceed along parameters covered in this section, and

---

**95.** Both parties agree that initial calculation of plaintiff's pay from an ES–4 level is appropriate. The EEOC's policy generally is to provide employees who are promoted to the SES with a six percent raise, but for employees with particularly high salaries from long service with the EEOC, the percentage increase was reduced to avoid placing a newly hired employee into the SES at the highest level possible, an ES–6. (Tr. 2014–15.) An ES–4, therefore, reflects a reasonable compromise between these policies.

**96.** Defendant apparently relies on the testimony of Patricia Johnson, Director of the Human Resources Management Service, for the argument that plaintiff's step level should be decreased to an ES–1 in 1991. While Johnson did testify that she made charts calculating Terry's appropriate back pay, which she set at ES–1 for 1991, Johnson explained that she so calculated because "there were a number of positions that he applied for during that period of time." (Tr. 2017.) Thus, she did not reach the ES–1 figure by aggregating plaintiff's claims and calculating from 1984 as is appropriate in this case, but rather she set the ES–1 level taking into consideration only

plaintiff's 1991 claims. For this reason, her back pay chart for 1991 is inapplicable to the Court's calculations.

**97.** Johnson testified that, based on her experience, it is not possible to predict whether a particular employee will get an ES level increase during a certain year:

Because it is dependent on that individual's performance evaluation and that final rating. Generally, an employee has to be rated at the outstanding level in order to get a bonus, and more often than not a level movement. There have been situations where individuals are rated at the highly effective level and they may get a level movement.

(Tr. 2026.) As a general rule, directors at headquarters receive increases more frequently than field directors. (Tr. 2022.) *See* Ex. 200 for SES level increase information from fiscal year 1985 to fiscal year 1993.

**98.** An Order of Reference for settlement conference has been made by separate order of the Court.

shall concern all aspects of the back pay award, including benefits, bonuses, and interest. The parties shall submit a figure to this Court one month subsequent to the Court's Opinion in this case.[99]

Should the parties fail to reach a settlement figure within thirty days, the Court will hold an evidentiary hearing to supplement the record on the issue of back pay, benefits and bonuses, in light of the hiatus between the close of evidence and the filing of this Opinion. In the absence of settlement, the evidentiary hearing will be held on Friday, June 21, 1996, at 9:30 a.m. The parties will have until 4:00 p.m. that day to submit any further proof on the issue of back pay, benefits, and bonuses to make current all findings in this case.

### IV. CONCLUSION

The Court finds that defendant discriminated and retaliated against plaintiff in violation of Title VII. Defendant discriminated on the basis of race as to Counts I, III, and IV, discriminated on the basis of sex as to Count III, and illegally retaliated against plaintiff as to Counts II, III, and IV.

Defendant is hereby ORDERED to place plaintiff in the SES. Plaintiff shall have the choice of the next three SES positions that become vacant. Defendant is ENJOINED from discriminating or retaliating against plaintiff in the future, and ORDERED to pay plaintiff $150,000.00 in compensatory damages, $8,858.14 in medical expenses, and reasonable attorneys fees. The issue of back pay, benefits and bonuses is REFERRED by separate Order of Reference for settlement conference. In the event that the parties do not settle within thirty days, an evidentiary hearing will be held before this Court.

SO ORDERED.

99. Accompanying the figure reached by settlement, the parties shall submit to the Court a detailed explanation of all calculations made, and the source of the figures used in reaching the award amounts.